# Illinois Official Reports

## Appellate Court

---

### *People v. Corral*, 2019 IL App (1st) 171501

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PEDRO CORRAL, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-1501 |
| Filed<br>Rehearing denied | March 29, 2019<br>May 3, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-401601; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Thomas C. Brandstrader, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Margaret G. Lustig, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Presiding Justice McBride and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a jury trial, defendant Pedro Corral was found guilty of first degree murder and personally discharging a firearm in connection with the shooting death of the victim, Giovanni Galindo. Subsequently, the trial court sentenced defendant to a term of 31 years in the Illinois Department of Corrections. In sentencing defendant, the trial court exercised its discretion pursuant to section 5-4.5-105(b) of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(b) (West 2016)) and did not impose the 25-year firearm enhancement based on the jury's finding that defendant personally discharged a firearm causing the victim's death.

¶ 2        Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in denying his motion to suppress identification, (3) the trial court erred in limiting the defense expert from testifying on her opinion regarding the eyewitness's identification of defendant as the shooter, and (4) the sentence imposed by the trial court was excessive and failed to follow the dictates of *Miller v. Alabama*, 567 U.S. 460 (2012). For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3                                            BACKGROUND

¶ 4        Defendant was charged with multiple counts of first degree murder, armed robbery, home invasion, and residential burglary arising from the September 5, 2014, shooting death of Galindo. Prior to trial, defendant filed a motion to suppress the identification made by Jose Vargas of defendant as the shooter. Vargas was an eyewitness to the offense. In the motion, defendant argued that the lineup was unduly suggestive because it consisted of only three other participants and there was a large age disparity between them.

¶ 5        At the suppression hearing, the defense presented the testimony of Detective Roger Murphy, who testified that on November 6, 2014, he assisted in conducting a lineup which included defendant and three other individuals. Because the lineup contained only four individuals, Detective Murphy obtained permission from his supervisor to conduct the lineup. Vargas had previously identified the shooter as a "younger male Hispanic," so Detective Murphy filled the lineup with three other individuals he believed resembled defendant. Two of the individuals were 17- and 19-year-old Hispanic males. The third individual was a 30-year-old police officer, who Detective Murphy requested participate in the lineup because there were not any other individuals in custody who resembled defendant. Detective Murphy testified that all of the individuals had medium to slim builds. Detective Murphy further testified that Vargas signed the lineup advisory form and was not informed that the individual he had previously identified in a photo array (defendant) would be in the lineup.

¶ 6        The defense rested, and the State presented the testimony of Detective Brian Daly. Detective Daly testified that he was assigned to investigate the death of the victim. On November 6, 2014, he was inside the room while the lineup was being conducted, and he allowed defendant to pick his position in the lineup.

¶ 7        After hearing arguments, the trial court denied the motion to suppress the identification, finding the lineup was not overly suggestive. The trial court found that the detectives complied with procedures, including obtaining approval from a superior officer to conduct a four-person lineup.

¶ 8       Prior to trial, the State filed a motion *in limine* seeking to preclude defendant's identification and memory expert, Dr. Kimberly McClure, from testifying as to her opinion on whether Vargas's identification of defendant was reliable. The trial court precluded the defense expert witness from testifying about the reliability of Vargas's identification itself and how that relates to defendant's guilt or innocence. The trial court, however, did allow the expert witness to testify regarding the factors that can affect the reliability of an eyewitness identification generally and the presence or absence of those factors in the case. In so ruling, the trial court explained that an expert witness could not testify as to the credibility of another witness.

¶ 9       The trial commenced in January 2017 with the State presenting the following evidence. Vargas, who was 22 years old at the time of the trial, testified that at 2 p.m. on September 5, 2014, he received a text message from his friend Luis Alfaro. The message indicated Alfaro wanted to purchase a half-pound of cannabis. Vargas contacted Galindo regarding the purchase. Galindo informed Vargas the price for a half-pound of cannabis was $2300 and Vargas would receive $100 from that sale. Vargas texted Alfaro with the details of the sale, and Alfaro responded that a 16-year-old would actually be purchasing the cannabis. Thereafter, Vargas received a phone call from a number he did not recognize. Vargas was initially surprised by the voice he heard on phone because he expected it to be from a 16-year-old; however, the voice on the phone sounded like that of a full-grown male. The individual on the phone was later identified by Vargas as Anthony Guedes.

¶ 10      At 4:26 p.m., Vargas texted Guedes asking him where they were. Guedes responded almost immediately with his location. Vargas went to the alley behind a convenience store where he observed a dark colored TrailBlazer. Guedes exited the front passenger seat of the TrailBlazer and the 16-year-old exited the backseat. They entered Vargas's vehicle. Guedes sat in the front passenger seat, and the 16-year-old sat in the backseat. Vargas turned around and greeted the 16-year-old. According to Vargas, he had a full view of the 16-year-old's face.

¶ 11      Vargas identified the 16-year-old as defendant in court. Initially, Vargas pointed to another 16-year-old in the gallery who "looked like" defendant. Because a screen was blocking his view, the court requested that Vargas step down from the witness stand and move to the middle of the courtroom, at which time Vargas noticed defendant and identified him as the shooter. On cross-examination and redirect, Vargas maintained his in-court identification of defendant as the shooter.

¶ 12      Vargas continued to testify that, after Guedes and defendant entered his vehicle, he drove three blocks to Galindo's house with the TrailBlazer following him. Vargas testified that, while Guedes and defendant seemed "all right," Vargas was suspicious and continually checked his rearview mirror to keep his eye on defendant. During the drive, defendant was quiet and kept his head down. Not three minutes later, Vargas arrived at Galindo's residence, and they exited the vehicle. Vargas noticed defendant walk to the TrailBlazer, obtain a small roll of money, and then walk back toward him. It was raining, so defendant had the hood of his sweatshirt over his head, but Vargas could still view defendant's face.[1] Vargas informed Galindo they had arrived, and Galindo instructed him to park in the alley. Vargas, Guedes, and defendant entered Vargas's vehicle again, and Vargas parked in the alley next to Galindo's

_____

[1]The record indicates that this was the only time defendant had the hood of his sweatshirt over his head.

- 3 -

garage. Vargas, Guedes, and defendant exited the vehicle and proceeded to knock on the basement door. Galindo answered the door, and the four individuals stood in the vestibule. Upon entering the vestibule there was another threshold leading to a basement apartment that was under construction. Four Mason jars filled with cannabis were on top of a washing machine that was in the vestibule. Vargas testified that the area where they stood was narrow and, from where he was standing, he had a clear view of Guedes but could only view defendant's shoes and part of defendant's sweatshirt.

¶ 13    Galindo handed a Mason jar to Guedes. Guedes opened the jar and removed some cannabis. Guedes handed the cannabis to defendant, who indicated it was "good." Defendant then handed the cannabis back to Guedes, who placed it back in the Mason jar and closed the lid. Guedes attempted to negotiate a lower price for the cannabis, and Galindo held firm on his price. Guedes then turned to defendant and instructed him to pay Galindo. At that moment, Vargas viewed defendant's hand extend and heard the sound of a handgun being "clock[ed] back." Vargas then noticed a handgun in defendant's left hand. Vargas testified he froze in disbelief as he observed defendant point the handgun toward Galindo. Galindo then lunged toward defendant and Guedes. According to Vargas, he "could see for like a split second" Guedes and Galindo "kind of tumbling one over another and fighting." Vargas then turned and ran toward the back of the basement apartment.

¶ 14    As Vargas ran he heard three to five gunshots, the sound of a Mason jar breaking, and then there was silence. Vargas waited a few moments before approaching Galindo. Vargas called 911 but did not tell the truth regarding what had occurred. Instead, Vargas informed the 911 dispatcher that he was walking in the alley when he heard gunshots and found Galindo injured. Shortly thereafter, the paramedics and detectives arrived. Vargas spoke with the detectives and relayed to them the same version of the story he had provided to the 911 dispatcher.

¶ 15    Although Vargas admitted he initially lied to the detectives, he testified he "tr[ied] to give them the best possible description" of the offenders. Vargas described defendant as "a younger 16, 17-year-old male, short hair, wearing dark colored clothing, possibly black jeans and a dark colored hoodie as well." Ultimately, Vargas provided the detectives his cell phone number and was allowed to leave.

¶ 16    Five days later, Vargas voluntarily went to the police station where he was informed that the detectives had recovered information from Galindo's cell phone, which included his text messages to Vargas regarding the drug transaction. Confronted with this information, Vargas told the detectives the truth of what occurred. He gave the detectives consent to search his cell phone and identified Alfaro from a photo array. On September 16, 2014, Vargas also identified Guedes from a photo array. Over a month later, on October 23, 2014, Vargas identified defendant from a photo array. In regards to the photo array, Vargas testified he identified defendant within five seconds and had no doubt that defendant was the shooter. Thereafter, on November 6, 2014, Vargas identified defendant in a physical lineup within "two seconds" of viewing him.

¶ 17    On cross-examination, Vargas testified that while he had Guedes's cell phone number he did not provide it to the detectives. He also could not recall if he deleted text messages from his phone that were sent and received between September 1, 2014, and September 8, 2014. Vargas further testified that he received six phone calls from Guedes between 5:30 p.m. and 5:58 p.m. on the evening of September 5, 2014. Guedes's phone records indicated these calls were as few

as 24 seconds in length and as many as 75 seconds in length. Vargas could not recall these conversations.

¶ 18 On redirect, Vargas testified that Guedes called him after the shooting occurred but he did not take any of these calls. According to Vargas, he was speaking with the detectives at the time these phone calls were made. He further clarified his testimony that he did not observe defendant touch the Mason jar.

¶ 19 A series of text messages that were exchanged between Vargas and Alfaro and between Vargas and Guedes were admitted into evidence and published to the jury.

¶ 20 Abdalla Abuzanat, an evidence technician for the Chicago Police Department, testified that on September 5, 2014, he was assigned to process a crime scene in the 6200 block of South Kilpatrick. Abuzanat observed Galindo on the floor directly inside the basement door. There was also broken glass, marijuana, cartridge casings, and blood on the floor. Abuzanat photographed and took video of the scene. Abuzanat recovered six cartridge cases. He also observed blood near the entrance of the exterior door, the door frame, and where the victim was lying. He also collected pieces of broken glass and the Mason jar lid. On cross-examination, Abuzanat testified that blood was discovered on the bottom of the door at the top of the stairs that led to the first floor apartment. The photographs taken by Abuzanat were admitted into evidence and published to the jury.

¶ 21 Caryn Tucker, a firearm and toolmark expert employed by the Illinois State Police Division of Forensic Services, testified that she analyzed the eight bullets recovered from the victim's body and the six cartridge casings and determined that they were all fired from the same firearm. The weapon was unknown because she was never provided with a weapon to compare with the bullets and casings.

¶ 22 Kenan Hasanbegovic, a forensic scientist for the Illinois State Police, testified that he conducted DNA analysis on five blood samples recovered from the scene. He received DNA standards from the victim, Alfaro, Guedes, and defendant and compared those standards to the blood samples recovered. The DNA from the five samples matched that of the victim.

¶ 23 Dr. Latanja Watkins, an assistant medical examiner employed by the Cook County Medical Examiner's Office, testified that she performed the autopsy on Galindo. She observed eight bullet wounds on Galindo's body: four in his back, one to his side, one to his right arm, one to his abdomen, and one to the back of his right leg. According to Dr. Watkins, there was no evidence of close-range firing, which she defined on redirect as being in a range of less than three feet. Dr. Watkins opined that Galindo's cause of death was multiple gunshot wounds and the manner of death was homicide. On cross-examination, Dr. Watkins testified that the wound path for all but one of the eight bullets was downward; only the gunshot wound to the abdomen had a "slightly upward path."

¶ 24 John Gorski, a latent fingerprint analyst for the Illinois State Police, testified that he discovered two latent fingerprints suitable for comparison from the lid of the Mason jar. One of the latent fingerprints matched the fingerprint of Gloria Valdez (the victim's girlfriend); the other matched the fingerprint of Guedes. On cross-examination, Gorski testified that he did not discover defendant's fingerprints on any of the items he examined in this case.

¶ 25 Detective Murphy testified that on September 5, 2014, at 5:11 p.m. he was assigned to the homicide investigation involving the death of Galindo. When he arrived at the scene at 5:30 p.m. he observed Galindo on the floor of the vestibule surrounded by broken glass and six

cartridge casings. Detective Murphy then interviewed Vargas, who provided him with a description of two individuals. According to Detective Murphy, Vargas described them as two male Hispanics, one who was "husky, about 30, black hair with some specks of gray in it, and a beard. The other one he said was a young, thin Hispanic, about 16 or 17" with black clothing. Vargas also provided Detective Murphy with his cell phone number.

¶ 26 Galindo's cell phone was recovered and examined. Detective Murphy read text messages between the victim's cell phone and another phone number indicating they were trying to set up a marijuana deal with a third party. Detective Murphy later determined that the phone number belonged to Vargas. Detective Murphy then interviewed Vargas again on September 10, 2014, and Vargas provided him with the information that was later consistent with Vargas's testimony. Vargas also gave Detective Murphy consent to search his cell phone. He also provided Detective Murphy with Guedes's and Alfaro's cell phone numbers. Subsequently, Detective Murphy interviewed Alfaro, who provided him with Guedes's name. On September 16, 2014, Detective Murphy created a photo array with Guedes's photograph and presented it to Vargas, who "immediately" identified Guedes as the "husky" individual. Guedes was subsequently arrested in Kissimmee, Florida, in January 2015.

¶ 27 Detective Murphy continued his investigation into the third individual identified as the shooter. On October 22, 2014, Detective Murphy had a conversation with Officer Slepski[2] of the Cook County Sheriff's Police Department regarding the remaining individual he was seeking to identify. Officer Slepski provided him with the nickname of an individual who went by "Flaco" and e-mailed him a photograph of "Flaco." The photograph, which was introduced into evidence and published to the jury, was an image of a group of individuals with the one identified as "Flaco" wearing a black basketball jersey with gold trim with no hat. The following day, Detective Murphy spoke with Officer Vin,[3] another officer who worked with Officer Slepski, who provided him with defendant's legal name as the individual in the photograph. Detective Murphy discovered defendant's photograph in the police database and created a photo array of five individuals including defendant using defendant's physical characteristics as a guide. According to Detective Murphy, there was no requirement at that time regarding the number of photographs that were to be included in a photo array. On October 23, 2014, Detective Murphy presented Vargas with the photo array. Out of the five individuals pictured, Vargas "immediately" identified defendant as the shooter within "seconds."

¶ 28 On November 6, 2014, defendant was placed in custody, and a physical lineup was conducted. After running a search of those individuals in custody who matched defendant's description, Detective Murphy could find no suitable individuals for the lineup. Accordingly, Detective Murphy obtained two Hispanic male volunteers from the neighborhood, a 17-year-old and a 19-year-old, to participate in the lineup. A 30-year-old male Hispanic police officer also participated. According to Detective Murphy, Vargas identified defendant in the lineup "immediately."

¶ 29 On cross-examination, Detective Murphy testified that no fingerprints, blood, or DNA belonging to defendant were discovered at the crime scene. He also testified that Vargas did not receive any phone calls while he was being interviewed. Moreover, Detective Murphy did

---

[2]Officer Slepski's full name does not appear in the record.

[3]Officer Vin's full name does not appear in the record.

not discover any of the phone calls from Guedes in Vargas's phone. Detective Murphy further testified that in the course of his investigation he obtained the phone records of Vargas, Alfaro, and Guedes. In examining those records, defendant's phone numbers (two phone numbers were attributed to defendant) were not found in any of those records. In addition, there were no calls to or from Vargas, Alfaro, or Guedes from defendant's parents' phone numbers. Detective Murphy also testified that, while he retrieved defendant's cell phone, it was missing the "SIM card" and therefore he did not submit the cell phone to the Regional Forensics Computer Laboratory for analysis.

¶ 30     The State rested and defendant moved for a directed verdict, which the trial court denied. The defense then presented the following testimony.

¶ 31     Dr. Kimberly McClure testified as an expert in the field of eyewitness identification without objection. Dr. McClure testified she reviewed the grand jury testimony, videotaped interviews of Vargas, the police reports, the photo array, and lineup, as well as Vargas's trial testimony. Dr. McClure testified that even under optimal circumstances, *i.e.*, where "a person has all the time in the world to view, the person is not under any duress or stress, [and] the person has an immediate opportunity to identify the person that they saw," there is only "67 to 70 percent" accuracy in those identifications.

¶ 32     Dr. McClure opined that the factors that tend to reduce the reliability of an eyewitness identification were present in the case. Regarding Vargas's degree of attention during his encounter with defendant, Dr. McClure testified that, according to Vargas's grand jury testimony, the encounter commenced as something "routine and not very memorable." She further testified that Vargas's focus of attention "seemed to be on the older adult male that was involved. *** It seemed as if the younger male involved said maybe a hand[ ] full of words at most, was pretty peripheral and not central to the interactions with Mr. Vargas and that would lead me to believe that the older adult male would be the center of Mr. Vargas's attention."

¶ 33     Dr. McClure also testified regarding a "phenomenon called inattentive blindness." According to Dr. McClure, "inattentive blindness" is where "we can interact with someone and we can see that person clearly, and it seems as if we are processing information about them but in fact we are not really processing information that's related to the person's face or how she or he might look and how we might subsequently be able to recognize them."

¶ 34     Dr. McClure also testified regarding "weapon focus" and that it was present in this case. According to Dr. McClure, "[s]tress does impact what we are able to remember about an experience as does when there's a weapon present." Dr. McClure explained that when a weapon is present, the observer's focus turns to the weapon: "One explanation for the weapon focus effect is most likely we attend to things that are most threatening to us." Thus, when an observer's focus is solely on a weapon, the observer does not process any additional cues that would subsequently assist in making an identification.

¶ 35     Dr. McClure further testified that the delay in time of identifying an individual "is going to decay any memory traits of anything you many have in anything you encoded or anything you have processed." Dr. McClure also discussed the "intervening variables" between the event and the actual identification that can impact memory. According to Dr. McClure, intervening variables "impact and change memory because we don't just witness the event and never talk about it again. *** We might tell our friends[, we] might tell our family members. Each time we are retrieving that information it has the potential to change how we remember that experience and how we remember the individual[ ] involved. It is not uncommon *** for these

intervening events to actually get incorporated into memories. We call that the misinformation effect."

¶ 36    Specifically addressing the 48-day delay between the shooting and Vargas being presented with the photo array, Dr. McClure testified that it is a "very long time" in terms of memory. Dr. McClure noted that after 72 hours there is a detrimental effect on memory and it "drops off quickly, very fast. After 72 hours, 40 to 50 percent is a ballpark figure that I am pulling from my recollection."

¶ 37    Dr. McClure also discussed the lineup administration guidelines of the Department of Justice. Dr. McClure explained that these federal guidelines were created to protect an innocent suspect who simply looks like the person the witness observed from being identified as a perpetrator. In regards to photo arrays, the federal guidelines recommend a minimum of five fillers, for a total of six photographs in the array. This creates a 16.6% chance that any given member of the array would be selected. These fillers should be selected based upon the eyewitness's description of the perpetrator. When the description lacks identifying characteristics like tattoos or scars, then it is important to ensure the photographs of the individuals in the array match the basic features of the eyewitness's description. In regards to lineup procedures, the guidelines recommend a minimum of four fillers, for a total of five individuals in the lineup.

¶ 38    Dr. McClure also explained that the guidelines recommend a double-blind procedure be employed where the detective who is administering the photo array or lineup does not know who the suspect is or where the suspect is placed and ideally should not have any knowledge of the case at all. Dr. McClure testified that these procedures are recommended because those administering the array or lineup "give off subtle cues and when our memory is maybe unreliable or a little faulty and we are not certain about things we look to cues in our environment that sort of lead us." These cues can be unintentional or intentional. In this case, Detective Murphy, who was the lead detective and therefore not an independent administrator, conducted the photo array and lineup. Dr. McClure further testified that it was problematic that defendant was the only individual who appeared in both the photo array and the lineup. According to Dr. McClure, one cannot be sure that Vargas's identification of defendant was because "he was actually there during the event or was it because he was the only person that was also in the photographic lineup."

¶ 39    On cross-examination, Dr. McClure testified she was not compensated for her testimony apart from her travel and accommodation expenses and that this was the first time she had testified as an expert in eyewitness identification. She did not interview anyone involved with the case in preparing her opinion in the case, only documents and videotaped interviews of Vargas. Dr. McClure testified she did not review the Chicago Police Department guidelines for administering photo arrays and lineups, only the federal guidelines. She was also unaware of how Detective Murphy presented Vargas with the photo array.

¶ 40    Dr. McClure explained that her statistic that 67 to 70% of eyewitness identifications are reliable was based on social cognitive experiments that are not oftentimes involving actual crimes. According to Dr. McClure, the studies, however, do attempt to mimic the stressors eyewitnesses to crimes would experience. Dr. McClure testified that "most of the time people are pretty accurate" when describing basic features such as gender, ethnicity, and general physicality.

¶ 41    Dr. McClure further testified that memories related to traumatic experiences can be retained over time and that an individual's memory can increase during a traumatic event. According to Dr. McClure, however, there is an upper limit to an individual's ability to retain memories when under duress. Once an individual's ability to cope with the stress is exceeded then his memory deteriorates.

¶ 42    Dr. McClure also testified that when one is questioned over a period of time there is not an increase in accuracy in memory, but an increase in confidence. This means that someone can be confident in his memory because he has had "retrieval fluency," *i.e.*, he has practiced retrieving it and told a story to himself and others for so long that he is confident he is correct when in fact nothing has happened to affect the individual's accuracy. To this end, Dr. McClure further testified that while repeating a memory during an interview can "lock in an accurate memory" that only occurs where there is no misleading information or misinformation provided during the interview, because that misinformation can also be incorporated into the memory leading to "irretrievable effects."

¶ 43    On redirect examination, Dr. McClure testified that "almost any opportunity [to view] is not quality opportunity [to view] when we are talking about processing information into memory." In this case, Vargas seemed as if he "wasn't really paying attention to the young perpetrator" and that the "young perpetrator *** seemed to be sort of a secondary character in the interactions up until the point where there was actually the weapon pulled."

¶ 44    Dr. McClure also testified that Vargas had the opportunity to go over the details of the event with detectives and the state's attorneys several times. In that vein, Dr. McClure testified that eyewitness confidence or certainty is not a good indicator of accuracy and that the retrieval process can actually inflate confidence "[s]o people appear as if they are more confident about what they saw but they are not any more accurate about what they experienced."

¶ 45    Rosalva Corral, defendant's mother, testified that on September 5, 2014, she went to work at 8:30 a.m. That evening a family barbeque was planned at her brother-in-law's residence in the Pilsen neighborhood. Her brother-in-law, Juan Corral; his wife, Angelica Corral; their two children, Andres and Michael; and she; her husband; and her two children, including defendant, were to be in attendance. After lunchtime, Rosalva spoke with defendant over the telephone and instructed him to be ready for Ruben Quiroga, defendant's cousin, to pick him up after 3 p.m. Rosalva testified after she finished work at 4:30 p.m. her husband picked her up from the train station and they ran errands. She then dropped her husband off at home and went to pick up defendant around 9 p.m. When she arrived, Juan, Angelica, their children, and her children were there. The children were playing video games, and the adults were in the kitchen. She left with defendant sometime after 10 or 11 p.m. and returned home. She further testified she did not know anyone named Anthony Guedes and that no one in her family was related to someone named Anthony Guedes.

¶ 46    On cross-examination, Rosalva testified that September 5, 2014, was the Friday after Labor Day and her son was not in school that day because she was intending to move to Chicago and had not enrolled him. She further testified that prior to her testimony she spoke with Angelica and Juan about what they did on September 5, 2014, together in a group.

¶ 47    Ruben Quiroga testified that on September 5, 2014, he was working construction in Chicago from 7 a.m. to 3 p.m. He picked up defendant from defendant's residence in the 7600 block of LeClaire Avenue in Burbank, Illinois, around 4:30 or 4:45 p.m. and took him to Angelica and Juan's house in Pilsen for a barbeque. They arrived in Pilsen at 5:30 or 5:40 p.m.

Ruben stayed to have a taco and left at 6 p.m. Ruben testified defendant was present at the barbeque the entire time he was present. On cross-examination, Ruben testified that prior to his testimony he spoke with his relatives about picking defendant up on September 5, 2014.

¶ 48　　Angelica Corral, defendant's aunt, testified that on September 5, 2014, she was at work from 8 a.m. until 2 p.m. After work she went home because she was having people over for a barbeque. Ruben brought defendant over, and defendant went to her sons' room and only came out for food. On cross-examination, Angelica testified that Ruben dropped off defendant at 5:30 p.m. and left around 6 p.m., after her husband came home. She further testified she could recall the events of September 5, 2014, because her son was to have gone back to college that day but instead left the following day.

¶ 49　　Defendant testified as follows. On September 5, 2014, he was 16 years old and resided in Burbank, Illinois. That afternoon he was at home. He did not attend school because he had not enrolled, as his parents were planning on moving to Chicago. Shortly after he woke up, his mother called to tell him to be ready for Ruben to pick him up. At 4 p.m. Ruben picked him up from the house, and they drove to his aunt's residence in Pilsen to attend the barbeque. According to defendant, it was his cousin Andres's last day home before going to college. When he arrived at his aunt's house, his aunt, uncle, and two cousins were there. He went to his cousin's room and stayed there until 9 p.m., when his mother picked him up.

¶ 50　　When presented with a photograph of Guedes, defendant indicated that he did not know him and was not friends with him. When asked whether he knew anyone named Guedes, defendant responded that he knew an Isaiah Guedes who he used to play baseball with before he moved away. According to defendant, Isaiah Guedes was his same age.

¶ 51　　On cross-examination, defendant testified that he never knew anyone with the name Anthony Guedes. Defendant further testified that when he was arrested on November 6, 2014, he was interviewed by Detective Murphy in the presence of defendant's father. The prosecutor then presented defendant with a portion of this videotaped interview and asked whether his response to the question, "do you know Guedes" was "Anthony, yeah." Defendant responded that he did not hear that and could not recall being asked whether he knew Guedes. When asked whether he was called "Flaco," defendant responded that his grandmother called him by that name as did his childhood friends. When asked what time Ruben picked him up on September 5, 2014, defendant responded that it was not "4:00 exactly. I said within that hour, yeah." He could not recall the weather conditions at the time.

¶ 52　　On redirect, defendant testified that Detective Murphy did not present him with a photograph of Guedes during the interview. He also testified that Detective Murphy did not refer to Guedes as "Anthony."

¶ 53　　The defense rested, and the State called Detective Murphy in rebuttal. Detective Murphy testified that there was light rain at 4:45 p.m. on September 5, 2014. At 5 p.m. the rain became heavy and lasted for three to five minutes. Light rain was intermittent shortly after 5 p.m. Detective Murphy further testified that in the course of his investigation of this offense he obtained a surveillance video from a business located in the 6300 block of South Keating. The surveillance video revealed that at 4:58 p.m. on September 5, 2014, there was heavy rain that cleared up at 5:04 p.m.

¶ 54　　Detective Murphy also testified regarding his interview of defendant on November 6, 2014. According to Detective Murphy, he asked defendant whether he knew Guedes, and defendant responded, "Anthony, yeah."

¶ 55    On cross-examination, Detective Murphy clarified that he did not ask defendant if he knew Anthony Guedes, only "Guedes" and that the interview terminated shortly thereafter. Detective Murphy further testified that he wrote in his report that defendant said he knew "Anthony Tony Guedes" and that Tony Guedes was in quotes "[b]ecause that was what Guedes was known by his nickname or informal name was Tony."

¶ 56    Defendant testified in surrebuttal that he had not viewed the videotape of the November 6, 2014, interrogation until it was played in court. He further testified that, when asked "do you know Guedes," his response was, "I think, yeah."

¶ 57    After closing arguments and jury instructions, the jury deliberated and found defendant guilty of first degree murder and that he personally discharged a firearm that proximately caused Galindo's death.

¶ 58    Following defendant's unsuccessful motion for a new trial, the trial court conducted a sentencing hearing. The State presented evidence in aggravation, which included the testimony of Galindo's mother, Sharon Lachcik, who expressed the emotional consequences she has suffered as a result of her son's death.

¶ 59    In mitigation, defendant presented the testimony of numerous witnesses. The first witness was Michael Donovan, the Catholic chaplain for the Archdiocese of Chicago who testified he met defendant while volunteering at the juvenile detention center. Donovan testified that he observed defendant mature over the years and that he has potential for increased rehabilitation.

¶ 60    Sister Sarah Nunez testified that she met defendant while she was volunteering at the juvenile detention center. Sister Nunez testified that when defendant was first incarcerated he was scared and nervous; she observed him "settle into the system recognizing that he had some deep thinking to do and he little by little started to speak more and more about the deep appreciation that he had, especially for his family." Sister Nunez also testified that defendant acknowledged he made "some choices that weren't great in his life but that he really wanted to step forward and make better on all the issues in his life that he had left aside."

¶ 61    Defendant's mother, Rosalva, also testified in mitigation. According to Rosalva, defendant loves his family and has matured since his imprisonment.

¶ 62    Defense counsel then requested, "based on his age at the time of the crime that you exercise your discretion and not imposing [*sic*] the 25 years, additional to the 20 that is the minimum on this particular case." Defense counsel argued that defendant had taken 19 courses while detained, received 14 merit certificates, and obtained very good grades in his classes. Defense counsel also referenced a letter from Cardinal Cupich in support of defendant and maintained that defendant has "already developed and starting [*sic*] to rehab, starting to grow up and become a person who is conscious about society and conscious of what he needs to do in order to be a successful and good citizen while in custody."

¶ 63    In response, the State argued that "the most important factor" in sentencing defendant was his age and referenced the *Miller* factors. The State maintained that there was no indication that defendant had diminished capacity and could not appreciate the consequences of using a handgun and shooting someone eight times. The State also pointed to the fact there was no evidence of "outside pressure" on defendant during the offense. Defendant also has a loving family and was able to participate in his defense. The State expressly stated it was not seeking a life sentence or a *de facto* life sentence. Instead, the State requested the trial court balance defendant's age and circumstances with the seriousness of the offense.

¶ 64    Defendant then made a statement in allocution. Defendant apologized to Galindo's family for their loss, professed his innocence, and requested the trial court have mercy on him.

¶ 65    The trial court then rendered the following sentence:

"I have listened to the presentation of evidence, the arguments of the attorneys and Mr. Corral. And also taken into consideration the new statute which deals with young people under eighteen years of age and the United States Supreme Court [decision] in Miller versus Alabama and Morris and other Illinois Appellate court cases.

* * *

Looking at this case here for sentencing, I am impressed with Mr. Corral's concern for Gino's family. I understand what he said, that he doesn't—he does [*sic*] in effect disappointed with the jury but respects the system itself.

I have looked at the outstanding things that he has done while being in juvenile detention. It is just a shame that these things don't take place without some catastrophe happening, that people wake up and see what's going on in life.

Considering the United States Supreme Court case and our other courts that have said, youth is the most important factor here. We have seen witnesses testify as to Mr. Corral's progress as far as his potential for rehabilitation.

First off, under these circumstances, I am not going to—there is an enhancement, if you kill somebody during the commission of a first degree murder and you do it with a firearm and cause the death of that individual, then the sentence there, which is an enhancement is 25 years to natural life.

It is more serious a sentence than the first degree murder itself. I don't understand the logic. I am not going to impose the enhancement because of the factor [*sic*] that have been presented because of the change for rehabilitation.

Looking at the impetuosity that occurred during the event, certainly nobody [would] condone this event. It was wrong. So the enhancement will not be applied.

To the sentencing on first degree murder, I am looking at the statutory factors in mitigation, statutory factors in aggravation and non-statutory factors in mitigation along with the new statute and the case law that applies at this time.

At this time, I am going to sentence Mr. Corral to 31 years in the state penitentiary. Three years MSR."

This appeal followed.

¶ 66                                    ANALYSIS

¶ 67    On appeal, defendant maintains that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in denying his motion to suppress identification, (3) the trial court erred in limiting the defense expert from testifying on her opinion regarding the eyewitness's identification of defendant as the shooter, and (4) the sentence imposed by the trial court was excessive and failed to follow the dictates of *Miller*. We address each argument in turn.

¶ 68                          Sufficiency of the Evidence

¶ 69        Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt where the only evidence linking him to the crime was the identification testimony of Vargas which was not credible and unreliable. Defendant further asserts that the State failed to meet its burden of proof where Vargas identified defendant after viewing a suggestive photo array and lineup and defendant presented an unrebutted alibi. Defendant maintains that for these reasons, the evidence presented by the State was insufficient to sustain his conviction.

¶ 70        The State responds that a positive identification of a defendant by a single witness is sufficient to sustain a conviction, provided the witness had an opportunity to view the defendant under conditions permitting a positive identification. The State maintains that because Vargas viewed defendant for 30 minutes prior to the shooting he had an adequate opportunity to observe defendant under conditions permitting a positive identification and defendant's conviction should be affirmed.

¶ 71        When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Martin*, 2011 IL 109102, ¶ 15. On review, all reasonable inferences from the evidence are drawn in favor of the State. *Jackson*, 443 U.S. at 318-19; *Martin*, 2011 IL 108102, ¶ 15. The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 72        The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard but only where the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id.* However, the fact a jury did accept testimony does not guarantee it was reasonable to do so. *Id.* Reasonable people may on occasion act unreasonably. *Id.* Therefore, the fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Id.* Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 73        Defendant here was convicted of first degree murder. A person commits first degree murder if, in performing the acts that cause a death, he or she either intends to kill or do great bodily harm to the victim or another individual, knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another. 720 ILCS 5/9-1(a)(1) (West 2016). Defendant, however, does not contest the elements of the offense but instead challenges the reliability of Vargas's identification as well as his credibility. We first examine the reliability of Vargas's identification of defendant.


¶ 74                 *Reliability of Vargas's Identification of Defendant*

¶ 75        Where identification is the main issue, the State must prove beyond a reasonable doubt the identity of the individual who committed the charged offenses. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). In assessing identification testimony, Illinois courts utilize a five-factor test

established in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *People v. Slim*, 127 Ill. 2d 302, 307 (1989). The factors are "(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Slim*, 127 Ill. 2d at 307-08.

¶ 76    Prior to applying the *Biggers* factors, we observe that the jury was also presented with the expert testimony of Dr. McClure on the subject of eyewitness identification reliability. When a defendant appeals his conviction arguing the evidence was insufficient, it is our duty to examine *all of the evidence* presented in the light most favorable to the State, not just the evidence presented by the State. See *Jackson*, 443 U.S. at 319. Thus, our analysis will encompass not only the evidence presented by the State but also the evidence presented by the defense, including the expert testimony.

¶ 77    Defendant first challenges Vargas's testimony identifying him as the shooter. Defendant maintains that prior to the shooting Vargas's attention was focused on Guedes and Vargas had a limited opportunity to view the younger offender. When considering whether a witness had an opportunity to view the offender at the time of the offense, courts look to "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Carlton*, 78 Ill. App. 3d 1098, 1105 (1979). While Dr. McClure testified that viewing a person's face over 30 minutes was a brief period of time and that Vargas's attention was focused on Guedes, the jury was also presented with evidence that Vargas had the opportunity to view defendant's face consistently for those 30 minutes. Vargas testified he first viewed defendant's face when he exited the backseat of the TrailBlazer and entered Vargas's vehicle. Vargas then turned around and greeted defendant. During the three-block ride to Galindo's residence, Vargas testified he viewed defendant in the rearview mirror. Upon reaching Galindo's residence, Vargas viewed defendant's face as he walked from the TrailBlazer back toward him. The evidence established that defendant did have a hood over his head at this time because it was raining, but the fact defendant wore a hood over his head does not necessarily mean Vargas could not observe defendant's face. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 109 (eyewitness had a sufficient opportunity to view the defendant's face despite the fact the defendant was "wearing a sweatshirt with his hood up"). Moreover, the record indicates that this was the only time defendant was wearing the hood up over his head. Thereafter, defendant reentered Vargas's vehicle, and they drove to the alley. Defendant then followed Vargas to the basement of Galindo's residence. While Vargas testified he could not view defendant's face during this portion of their encounter, the evidence demonstrates he had ample opportunity to view defendant's face prior to the drug deal.

¶ 78    In regards to the second *Biggers* factor, the witness's degree of attention at the time of the offense, the testimony was clear that Vargas was focused on defendant in the minutes leading up to the shooting. Although Dr. McClure testified that Vargas's focus was primarily on Guedes, such testimony does not imply Vargas was not paying attention to defendant. In fact, Vargas testified in detail regarding defendant's demeanor and mannerisms during the drive to Galindo's residence and his behavior during the drug deal. See *People v. Malone*, 2012 IL App (1st) 110517, ¶ 32 (eyewitness had a high degree of attention prior to when the defendant brandished a handgun in an armed robbery).

¶ 79     As to the third *Biggers* factor, the accuracy of the witness's prior description of the defendant, the testimony established that Vargas initially identified defendant as a thin 16- to 17-year-old Hispanic male wearing dark colored clothing. Defendant, who was a thin 16-year-old at the time of the offense and is a male Hispanic, met that description. See also *Slim*, 127 Ill. 2d at 309 (a witness's positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made).

¶ 80     The fourth *Biggers* factor goes to the witness's level of certainty at the subsequent identification. Vargas testified that he indentified defendant as the shooter within 3 seconds of viewing the photo array and between 5 to 10 seconds upon viewing the lineup. Detective Murphy corroborated this account when he testified that Vargas identified defendant in the photo array and lineup "immediately." Accordingly, the evidence demonstrates that Vargas identified defendant definitively in the photo array as well as in the lineup. See *Green*, 2017 IL App (1st) 152513, ¶ 112 (the eyewitness never wavered in his degree of certainty that the defendant was the shooter, despite not identifying the defendant until three months after the shooting).

¶ 81     The final *Biggers* factor, the length of time between the crime and the identification confrontation, also weighs in favor of the State. Here, Vargas was presented with the photo array including defendant's image 48 days after the offense, and his identification of defendant in the lineup occurred 14 days thereafter. Courts have found identifications to be reliable even where they were made a considerable time after a crime. See *Malone*, 2012 IL App (1st) 110517, ¶ 36 (identification reliable where made a year and four months after crime); *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (identification made two years after the offense). Even in the face of Dr. McClure's testimony that memory significantly diminishes over time, the jury concluded that Vargas's identification of defendant as the shooter was accurate. See *Jackson*, 443 U.S. at 319 ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.)).

¶ 82     After weighing each factor, we conclude Vargas viewed the shooter under circumstances permitting a positive identification. We observe that "[n]ormally, the jury decides the weight that an identification deserves, and the less reliable the jury finds the identification to be, the less weight the jury will give it." *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008). Here, the jury had the opportunity to determine the credibility of the witnesses and the weight to be given to their testimony. *Jackson*, 232 Ill. 2d at 281. The trial court weighed the evidence and by their verdict found that Vargas's identification was reliable. We cannot say, when viewed in the light most favorable to the State, that the identification of defendant as the shooter was insufficient, and we will not substitute our judgment for that of the trial court and the jury in regard to the reliability or weight of the identification.

¶ 83                                     *Vargas's Credibility*

¶ 84     Defendant maintains that Vargas's testimony is not credible because he lied to the 911 dispatcher, did not tell the truth to the detectives after the shooting, did not inform the detectives that Guedes was calling him on the same day, and he identified the wrong person in the courtroom.

¶ 85      The arguments set forth by defendant are a general attack on the credibility of Vargas. Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the evidence but do not automatically create a reasonable doubt of guilt. *People v. Adams*, 109 Ill. 2d 102, 115 (1985). The trier of fact must judge how flaws in parts of a witness's testimony, including inconsistencies with prior statements, affect the credibility of the whole. *Cunningham*, 212 Ill. 2d at 283. The trier of fact may accept or reject all or part of a witness's testimony. *Id.*

¶ 86      Here, Vargas was forthcoming in his testimony that he did not tell the 911 dispatcher or the detectives at the scene of the offense that he was present when the shooting occurred. Vargas also admitted that he did not come forward with the truth until the detectives informed him that they obtained his text messages to Galindo implicating him in the drug deal. The jury had before it this testimony, and it was in their purview to judge Vargas's credibility. See *id.*

¶ 87      Moreover, the jury was present when the alleged misidentification of defendant in the courtroom occurred. Defendant insists that Vargas did not identify him but another 16-year-old Hispanic male that "looked like" defendant. Our review of the record reveals, however, that Vargas's view of the defense table was blocked by a screen and that, as the State asked him if he could identify the shooter in court, they instructed Vargas to "[s]tand up if you have to, if anything is blocking your view" and to "get down if you have to get down to get a better view from the screen." The trial court also instructed Vargas to go to the middle of the courtroom to better observe the whole courtroom. Once Vargas stepped down from the witness stand he had a full view of the courtroom, whereupon he identified defendant as the shooter. The jury observed this entire exchange and Vargas's identification of defendant, and it was for the jury to determine his credibility. We can find no substantial discrepancies in his testimony that warrant reversal on this basis. See *id.* at 284 (nothing in the record demonstrated that the entirety of the witnesses' testimony was unworthy of belief).

¶ 88                                        *Alibi Testimony*

¶ 89      Lastly, defendant asserts that his alibi was strong and unimpeached. According to defendant, the evidence he presented demonstrated that on September 5, 2014, he was at home until his cousin picked him up around 4:30 p.m. They then drove to his aunt's residence in Pilsen, arriving at 5:30 p.m. His aunt testified that defendant remained at her home until 9 p.m., when his mother picked him up. Defendant maintains that his testimony along with that of his mother, cousin, and aunt are all consistent with one another and that it accounts definitively for his whereabouts at the time the shooting occurred.

¶ 90      Viewing all of the evidence in the light most favorable to the State, as we must, the evidence in this case sufficiently established that defendant participated in the shooting of Galindo at approximately 5 p.m. on September 5, 2014. Although defendant presented an alibi defense, we note that the trier of fact is not obligated to find the testimony of alibi witnesses to be more credible than the testimony of the State's witnesses, especially where the alibi witnesses are related to the accused and possess an obvious bias. See, *e.g.*, *People v. Gabriel*, 398 Ill. App. 3d 332, 342 (2010); *People v. Mullen*, 313 Ill. App. 3d 718, 729 (2000). Furthermore, the jury was presented with testimony from defendant's mother, cousin, and aunt wherein they admitted that they had discussed the events of September 5, 2014, "as a group." In addition, the weight to be given alibi evidence is a question of credibility for the trier of fact, and there is no obligation on the trier of fact to accept alibi testimony over positive

identification of an accused. *Slim*, 127 Ill. 2d at 315. We reiterate that a reviewing court should not substitute its judgment for that of the trier of fact. *Jackson*, 232 Ill. 2d at 281. Here, the jury heard the evidence and inconsistencies that defendant relies on to support his challenge to the sufficiency of the evidence and concluded that defendant was the individual who shot and killed Galindo.

¶ 91    In sum, defendant's challenge to the sufficiency of the evidence essentially asks this court to substitute our judgment for that of the jury and resolve the conflicts apparent in the evidence in his favor, which we cannot do. *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 45. Moreover, physical evidence and a motive for the shooting were unnecessary to corroborate an eyewitness account. See *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23 ("[b]ecause the trial court found [the witness's] identification and testimony to be credible, the lack of physical evidence had no bearing on [the defendant's] conviction"); see also *People v. Agnew-Downs*, 404 Ill. App. 3d 218, 228 (2010) (motive is not an essential element of the crime). Considering the record in the light most favorable to the State, we are unable to conclude that the jury's finding is so improbable that it creates reasonable doubt as to defendant's guilt.

¶ 92                           Motion to Suppress Identification

¶ 93    Defendant asserts it was an error for the trial court to deny the motion to suppress pretrial identification evidence. Defendant maintains that the photo array and lineup were "highly suggestive" because defendant appeared to be substantially younger than all of the other fillers and Detective Murphy conducted the photo array and lineup with insufficient fillers. Defendant further argues that the new statute regulating lineup identification procedures (725 ILCS 5/107A-2(a)(1), (f)(3) (West 2016)) would have precluded the photo array and lineup procedures used here.

¶ 94    The State maintains that the trial court properly denied the motion to suppress where defendant failed to meet his burden to prove the identification was impermissibly suggestive. The State further argues that the new statute does not apply to defendant's case where it became effective on January 1, 2015, after the events of this case occurred.

¶ 95    When challenging the propriety of a pretrial identification procedure, the defendant bears the burden of proving that the procedure was unnecessarily suggestive and created a substantial likelihood of misidentification. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39. The State may rebut defendant's showing by "clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). Courts look to the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification. *Lawson*, 2015 IL App (1st) 120751, ¶ 39. The reviewing court may also consider the evidence presented at trial as well as the suppression hearing. *Id.* Where the challenged identification procedure is a photo array or lineup, individuals selected for the array or lineup need not be physically identical. *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007). Differences in the appearances of the participants go to the weight of a witness's identification, not to its admissibility. *People v. Jones*, 2012 IL App (1st) 100527, ¶ 24. A trial court's factual determination that an identification procedure was not unduly suggestive should not be reversed unless it is against the manifest weight of the evidence. *People v. Gaston*, 259 Ill. App. 3d 869, 876 (1994).

¶ 96    We first turn to consider defendant's contention that section 107A-2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/107A-2 (West 2016)) supports his conclusion that

the photo array and lineup procedures employed in this case were suggestive. Section 107A-2, which was enacted by the Illinois legislature on January 1, 2015, governs identification procedures. *Id.* The statute sets forth standards and protocols to be utilized by law enforcement officers during their investigative identification endeavors and mandates that only one suspected perpetrator may be included in a given lineup (*id.* § 107A-2(f)(3)(A)), that at least five fillers be included in a photo array (*id.* § 107A-2(f)(3)(C)), and that the suspected perpetrator be placed in a different position in a physical lineup or photo array for each eyewitness called upon to make an identification (*id.* § 107A-2(f)(4)). Although there is no dispute that the identification procedures employed in the instant case did not comport with some of the aforementioned statute's mandates, the statute was not in effect when the witnesses in this case were shown photo arrays and viewed lineups in 2014. Given that the statute did not govern the lineup procedures utilized in this case, it does not inform our review of defendant's challenge to the propriety of those procedures. See *People v. Moore*, 2015 IL App (1st) 141451, ¶ 21, *overruled on other grounds by People v. Hardman*, 2017 IL 121453.

¶ 97     Furthermore, our review of the record reveals that the trial court's determination that the identification techniques utilized in this case were not unduly suggestive is not against the manifest weight of the evidence. First, nothing in the record indicates that the photo array presented to Vargas was suggestive. The photos are all the same size and possess similar clarity. In addition, all of the men in the photo array appear to be in the same age range and possess similar complexions, eye colors, and nearly identical short hairstyles. No tattoos are visible in any of the pictures.

¶ 98     Our review of the lineup, however, is not so straightforward. At the suppression hearing Detective Murphy testified that he utilized two "kids" from the surrounding neighborhood (ages 17 and 19) in the lineup because he was having difficulty finding individuals in custody who met the description of the shooter. To that end, he also utilized a fellow officer to participate in the lineup. While all three fillers were Hispanic males with dark hair and dark eyes, the officer, however, happened to be 30 years old and was heavyset. The disparity in the continuity between the two neighborhood kids, the officer, and defendant is obvious. Thus, defendant was essentially one of only three individuals who met Vargas's previous description of the shooter. Defendant, however, does not present us with any argument or authority that a three-person lineup is unduly suggestive and instead argues that the State failed to prove by clear and convincing evidence that Vargas's identification of defendant as the shooter was based solely on his independent recollection of the events leading up to shooting.

¶ 99     Even if a defendant can meet his or her burden and prove that a lineup was suggestive, the State may overcome this showing by clear and convincing evidence that the eyewitness identified the defendant based on his or her independent recollection of the incident. *Brooks*, 187 Ill. 2d at 126. We have already determined that Vargas identified defendant based upon our weighing of the *Biggers* factors. Our review of the record reveals that Vargas identified defendant as the shooter based on what he observed and not on any suggestive procedures employed by the police. See *id.* at 132. Accordingly, we conclude the trial court did not err in denying defendant's motion to suppress. See *People v. Underwood*, 263 Ill. App. 3d 780, 786 (1994) (concluding "a possibly suggestive procedure" did not require reversal where the eyewitness made a positive identification of the defendants).

¶ 100                                    Expert Opinion Testimony

¶ 101      Defendant next asserts that the trial court erred in limiting Dr. McClure from testifying regarding her opinion of Vargas's identification of defendant. Defendant maintains that the Illinois Supreme Court in *People v. Lerma*, 2016 IL 118496, found that the use of eyewitness identification experts should be permitted in order to aid the trier of fact in understanding the potential flaws of eyewitness identifications and that Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) allows experts to give opinions on ultimate issues of fact. Accordingly, defendant concludes the trial court abused its discretion when it did not allow Dr. McClure to testify regarding her ultimate opinion that Vargas's identification was unreliable.

¶ 102      In response, the State argues that the trial court's limitation of Dr. McClure's testimony was in accordance with *Lerma*. In addition, the State contends that if the trial court had allowed Dr. McClure to opine directly on Vargas's testimony, the expert would have usurped the jury's role as arbiter of Vargas's credibility and allowed one testifying witness to comment directly on the credibility of another.

¶ 103      We begin our analysis with basic standards of review applicable to evidentiary issues. The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. *People v. Hall*, 195 Ill. 2d 1, 20-21 (2000). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Decisions of whether to admit expert testimony are reviewed using this same abuse of discretion standard. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); *People v. Reid*, 179 Ill. 2d 297, 313 (1997).

¶ 104      A criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf. *People v. Wheeler*, 151 Ill. 2d 298, 305 (1992). "In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288 (1990). Expert testimony addressing matters of common knowledge is not admissible "unless the subject is difficult to understand and explain." *People v. Becker*, 239 Ill. 2d 215, 235 (2010). In addressing the admission of expert testimony, the trial judge should balance the probative value of the evidence against its prejudicial effect to determine the reliability of the testimony. *Enis*, 139 Ill. 2d at 290. Furthermore, the necessity and relevance of the expert testimony should be carefully considered in light of the facts of the case. *Id*; *People v. Tisdel*, 338 Ill. App. 3d 465, 468 (2003) ("Trial courts should carefully scrutinize the proffered testimony to determine its relevance—that is, whether there is a logical connection between the testimony and the facts of the case.").

¶ 105      Relying on our supreme court's recent decision, *Lerma*, defendant maintains the trial court abused its discretion when it did not allow Dr. McClure to testify regarding her ultimate opinion of whether or not Vargas's testimony was reliable. In *Lerma*, the defendant was convicted of first degree murder after the evidence established that defendant, known as "Lucky," approached the front steps of a home, where he shot two people. *Lerma*, 2016 IL 118496, ¶ 5. The female victim dragged the critically wounded male victim into the house. *Id.* The male victim, in the presence of his father (who came onto the scene after hearing gunshots and his son's screaming) and the female victim, stated that "Lucky" shot me. *Id.* There was testimony that "Lucky" lived across the street from the house where the victims were shot, one

victim had been friends with "Lucky" for years, and "Lucky" had been fighting with a member of one victim's family. *Id.* The identification of the defendant as the shooter was established through the testimony of the surviving victim and the father of the deceased victim about the dying declaration of the decedent. *Id.* ¶¶ 5-6.

¶ 106    The trial court initially denied defendant's motion *in limine* seeking to present the testimony of Dr. Solomon Fulero, an expert witness on eyewitness identification. *Id.* ¶ 8. Defendant submitted a detailed motion containing Dr. Fulero's proposed testimony, consisting of a summary of the relevance of that testimony to the issues in that case and a detailed report authored by Dr. Fulero. *Id.* After its examination, the trial court denied this motion, finding that the eyewitnesses who identified "Lucky" knew him prior to the shooting and therefore were less likely to "misidentify someone they have met or know or [have] seen before than a stranger." (Internal quotation marks omitted.) *Id.* ¶ 10. The trial court also found that because the eyewitnesses knew the defendant, Dr. Fulero's testimony was irrelevant and "ran the risk" of "operating as his opinion on the credibility" of the eyewitnesses. (Internal quotation marks omitted.) *Id.*

¶ 107    During trial, after the State had presented the eyewitness testimony, defense counsel renewed his motion to call an identification expert. *Id.* ¶ 14. Because Dr. Fulero had since passed away, defense counsel tendered a report authored by Dr. Geoffrey Loftus, an expert in the field of human perception and memory, in support of his renewed motion. *Id.* Dr. Loftus's report tracked the content of Dr. Fulero's report, except in two instances. *Id.* First, Dr. Loftus stated that he would not "issue judgments" about whether witnesses' memories or assertions were correct and that any part that implied the unreliability of the eyewitness should not be construed as meaning that the defendant was innocent. *Id.* Second, Dr. Loftus's report discussed the issues involved with acquaintance identifications. *Id.* The trial court denied the renewed motion, stating that its denial was "consistent with the reasons *** set forth in detail when [the court] made the ruling on your similar motion with respect to Dr. Fulero." (Internal quotation marks omitted.) *Id.* ¶ 16. The defendant was convicted and appealed.

¶ 108    On appeal, this court reversed the trial court's ruling denying the admission of expert testimony of the matter of eyewitness identification and remanded the case. *People v. Lerma*, 2014 IL App (1st) 121880, ¶ 40. The appellate court found, because the trial court "failed to conduct a meaningful inquiry" (internal quotation marks omitted) into the proposed testimony of Dr. Loftus, instead relying on its reasons for denying the admission of Dr. Fulero's testimony, it committed reversible error. *Id.* ¶ 37. The reviewing court stated, "We also find it difficult to accord the customary degree of deference to the trial court's discretion in this case because the trial court, in relying on its prior ruling, explained itself with little more than a series of conclusions based on its personal belief." *Id.* ¶ 38. The State appealed.

¶ 109    The issue before our supreme court was "whether the trial court abused its discretion in denying defendant's request to allow Dr. Loftus's expert testimony on the reliability of eyewitness identifications." *Lerma*, 2016 IL 118496, ¶ 24. Prior to addressing the merits of the State's argument, the court recognized that the research concerning eyewitness identification is well settled and well supported and "in appropriate cases a perfectly proper subject for expert testimony." *Id.*

¶ 110    Our supreme court then acknowledged that "this is the type of case for which expert eyewitness testimony is both relevant and appropriate" given that the only evidence of the defendant's guilt was the eyewitness identifications made by two witnesses. *Id.* ¶ 26. There

was no physical evidence and no confession or other incriminating statements. *Id.* The court found that the trial court abused its discretion in denying the defendant's request to admit Dr. Loftus's expert testimony, finding the trial court's reasoning to be troublesome and stating, "even if [the trial court's reasoning] is defensible as to Dr. Fulero's expected testimony, it is not defensible as to Dr. Loftus's expected testimony," where Dr. Loftus's report addressed two important issues not addressed by Dr. Fulero: the acquaintance identification and his statement that he would not include any opinion on the credibility of any witness or identification. *Id.* ¶ 28. The supreme court observed,

> "[a]s discussed above, what we have in this case is the trial court denying defendant's request to present relevant and probative testimony from a qualified expert that speaks directly to the State's only evidence against him, and doing so for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case. A decision of that nature rises to the level of both arbitrary and unreasonable to an unacceptable degree, and we therefore find that the trial court's decision denying defendant's request to admit Dr. Loftus's expert testimony was an abuse of discretion." *Id.* ¶ 32.

¶ 111 The court further found that the error was not harmless because "there [was] no question that the error contributed to the defendant's conviction," it could not "be said that the other evidence in the case overwhelmingly supported the defendant's conviction," and "the excluded testimony from [the expert] was neither duplicative nor cumulative of other evidence, as the jury in this case heard precisely nothing in the nature of expert eyewitness testimony." *Id.* ¶ 33.

¶ 112 Here, unlike the facts of *Lerma*, the defense was not prohibited from introducing the testimony of Dr. McClure. Indeed, the trial court's denial of the State's motion *in limine* regarding Dr. McClure's expert testimony followed the dictates of *Lerma*. See *id.* ¶ 28. Dr. McClure testified at trial regarding the *Biggers* factors and applied those factors to the materials she reviewed in preparation for her testimony. The only testimony Dr. McClure was excluded from presenting was her own opinion as to whether or not Vargas's identification of defendant as the shooter was reliable. Notably, in *Lerma*, Dr. Loftus also indicated he would not "issue judgments" about whether the witnesses' memories or assertions were correct and that any part that implied the unreliability of the eyewitness should not be construed as meaning that the defendant was innocent. *Id.*

¶ 113 While the express issue of whether an eyewitness expert could ultimately opine on the reliability of another witness's identification of an offender was not discussed in *Lerma*, under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness. *People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989); *People v. Henderson*, 394 Ill. App. 3d 747, 753-54 (2009). This is because "[q]uestions of credibility are to be resolved by the trier of fact." *Kokoraleis*, 132 Ill. 2d at 264.

¶ 114 Thus, in this case the trial court did not abuse its discretion when it prohibited the defense from presenting Dr. McClure's opinion regarding the reliability of Vargas's identification. The record demonstrates that the trial court balanced the probative value of this proposed testimony against the possible prejudice that may arise from allowing Dr. McClure to testify in this regard and determined that, while Dr. McClure's testimony as an eyewitness expert was warranted, she would be limited in opining on Vargas's identification of defendant as being either reliable or unreliable. We observe that "[a] trial court is not required to allow an expert to render an opinion on every conceivable question simply because such expert is qualified to do

so." *People v. Cloutier*, 156 Ill. 2d 483, 502 (1993). Given the facts of this case, the trial court properly limited Dr. McClure's testimony, as such testimony could constitute direct, adverse comment on Vargas's credibility. See *Becker*, 239 Ill. 2d at 236 (one basis for exclusion is the impropriety of asking one witness to comment directly on the credibility of another). In doing so, the trial court correctly left the issue of whether the State established the identification of the shooter to the jury. See *People v. Jordan*, 282 Ill. App. 3d 301, 307 (1996). Therefore, based on the record before us, we find that the trial court's decision was not arbitrary or unreasonable and does not amount to an abuse of discretion. See *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 88 ("the trial court did not abuse its discretion in prohibiting the defense from presenting an expert witness on identification testimony, especially where [the expert witness] would be commenting on the 'reliability' of these witnesses, which is clearly a function of the jury, not a purported expert"). We therefore conclude that the trial court did not err in prohibiting Dr. McClure from testifying and rendering her opinion as to the reliability of Vargas's identification, especially where such testimony "is clearly a function of the jury, not a purported expert." *Id.*

¶ 115    In so concluding, we find defendant's argument that Dr. McClure should have been allowed to testify pursuant to Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) unpersuasive. Rule 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.* In support of his position, defendant relies on two cases: *People v. Hope*, 137 Ill. 2d 430 (1990), and *People v. Ward*, 61 Ill. 2d 559 (1975). Defendant maintains that in *Hope* an "expert witness [was] allowed to testify about a defendant's intoxication in relation to whether he acted intentionally in shooting a police officer." While this statement is true, it is also a misleading argument. In *Hope*, there was no question before our supreme court regarding the propriety of the expert's testimony and whether the trial court erred in allowing the expert to testify regarding the defendant's intent when committing the offense. See *People v. Anderson*, 112 Ill. 2d 39, 43-44 (1986) (a reviewing court is generally confined to consider only those issues raised by the appellant). Accordingly, our supreme court offered no guidance in that case that would aid in our determination here.

¶ 116    In regards to *Ward*, defendant argues that the expert in that case was "allowed to testify about [the] defendant's sanity at the time of the commission" of the offense. The issue in *Ward*, however, was not whether the expert could testify regarding the defendant's sanity but whether a report authored by a different doctor and relied upon by the expert to reach his conclusion could be admitted into evidence. *Ward*, 61 Ill. 2d at 565. The issue on appeal in *Ward* is thus inapposite to the issue in this case.

¶ 117    Having failed to cite any authority for his position that Rule 704 allows an eyewitness expert to opine regarding the reliability of the identification of another witness, we reiterate our conclusion that the trial court did not abuse its discretion. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017).

¶ 118                                    Sentence Excessive

¶ 119    Finally, defendant maintains that his sentence was excessive where the trial court did not consider the *Miller* factors and made only a "passing reference regarding age and potential rehabilitation." In response, the State asserts that the trial court expressly considered the *Miller*

factors and sentenced defendant well within the statutory guidelines and his sentence is thus not excessive.

¶ 120    The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). "[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant." *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). Accordingly, the reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 121    "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007); *People v. Snyder*, 2011 IL 111382, ¶ 36. Here, defendant was convicted of first degree murder with the jury specially finding that he discharged a firearm causing Galindo's death. The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2016). Due to the jury's finding that he discharged a firearm causing Galindo's death, defendant was also eligible for a 25-year firearm enhancement. *Id.* § 5-8-1(a)(1)(d)(iii). Because of his age at the time he committed the offense (16 years old) and his potential for rehabilitation, the trial court declined to impose the 25-year firearm enhancement, as allowed by statute, and sentenced defendant to 31 years' imprisonment, well within the statutory guidelines. See *id.* § 5-4.5-105(b) (the trial court "may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon possession of a firearm, possession with personal discharge, or possession with personal discharge that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person"); see *Jackson*, 375 Ill. App. 3d at 800 ("A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense.").

¶ 122    Defendant argues that, in sentencing defendant, the trial court did not properly apply and consider the *Miller* factors. In *Miller*, the Supreme Court found that a sentence of life without parole is unconstitutional for juvenile offenders if the sentence is mandatory. *Miller*, 567 U.S. at 470. The Court reasoned that minors are constitutionally different from adults for sentencing purposes, being more impulsive and vulnerable to negative influences and peer pressures than adults, and further lack fully formed character so that their actions do not necessarily indicate irreversible depravity. *Id.* at 471-77. The Court, however, continued to allow such sentences when they were based on judicial discretion. *Id.* at 479. The Court made *Miller*'s holding retroactive in *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016), and also instructed that states could remedy a *Miller* violation by allowing juvenile offenders with mandatory life sentences to become eligible for parole. *Id.* at ___, 136 S. Ct. at 736. "So far, the Supreme Court has reserved these rulings for the most severe punishments: death or life imprisonment." *People v. Evans*, 2017 IL App (1st) 143562, ¶ 11.

¶ 123    In *People v. Holman*, 2017 IL 120655, our supreme court expressly adopted a framework for evaluating whether a sentencing court's imposition of a life sentence on a juvenile offender complied with *Miller*:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 124    We observe that defendant does not argue that his sentence is unconstitutional and constitutes a *de facto* life sentence under *Miller*—indeed, based upon the sentence rendered he will be released at age 47. Instead, defendant merely argues that the trial court failed to consider defendant's youth and its attendant circumstances when sentencing defendant. The record reveals otherwise.

¶ 125    At the sentencing hearing the trial court engaged in a step-by-step analysis and consideration of the factors expressed in *Miller* and *Holman*. The trial court first inquired about defendant's age at the time of the offense. Defense counsel replied that defendant had "just turned 16 years old." Defense counsel then argued that, "because he was of young age and the case law and medical evidence in the case that when you are that young, your frontal lobe have [*sic*] not developed. Frontal lobes are what cause[ ] judgment" and that defendant had an "enormous potential for rehabilitation." Defense counsel, however, raised these points as part of a general argument and did not present any evidence as to how it applied specifically to defendant. Defense counsel and the State then argued the *Miller* factors in presenting their arguments regarding defendant's sentence. See *Holman*, 2017 IL 120655, ¶ 49 (a key feature of a juvenile's sentencing hearing is that the defendant had the "opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility" (citing *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736)). The trial court had before it evidence of defendant's age, his ability to appreciate the consequences of firing a weapon eight times, and defendant's home environment. In regards to defendant's degree of participation in the homicide, the trial court heard the testimony from the witnesses and reviewed the documentary evidence that demonstrated defendant was the shooter. The trial court was not presented with any testimony or evidence regarding familial or peer pressure that would have affected defendant or that he was incompetent in any way. Moreover, there was no evidence presented regarding defendant's environment or other relevant influences. Unlike the facts of *Miller*, there was no evidence in this case that defendant had no control over his environment or that he was unable to extricate himself from any peer pressure. See *Miller*, 567

U.S. at 478. Lastly, defense counsel presented vast evidence regarding defendant's potential for rehabilitation, all of which the record demonstrates the trial court considered.

¶ 126 In sentencing defendant to 31 years' imprisonment, the trial court declined to impose a sentence based on firearm enhancement. The trial court then explained the Supreme Court's decision in *Miller*, using it, as well as Illinois state cases discussing *Miller*, as a guide during sentencing. Specifically, the trial court stated it was impressed with the progress defendant made during the pendency of this case and expressed that if defendant had applied himself in such a manner prior to the shooting, Galindo might still be alive. Such a statement reflects the trial court's acknowledgement that defendant has matured since the offense occurred. Finally, the trial court encouraged defendant to "keep up the progress that you are doing" and "[s]omeday, you are still going to be relatively young and you can make a real positive impact on the community yourself." This statement demonstrates an understanding of the *Miller* and *Holman* factors because, by sentencing defendant to 31 years' imprisonment, defendant would still be able to have a productive life upon his release. It is clear from the record that the trial court took into full consideration defendant's youth, its attendant circumstances, and the factors set forth in *Holman* when sentencing defendant well within the statutory range. Accordingly, we affirm defendant's sentence. See *People v. Croft*, 2018 IL App (1st) 150043, ¶ 32.

¶ 127                                                          CONCLUSION

¶ 128 For the reasons stated above, defendant's conviction and sentence are affirmed.

¶ 129 Affirmed.