# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Jones*, 2012 IL App (1st) 100527

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT JONES, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-0527 |
| Filed | June 8, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for two counts of armed robbery were upheld over his contentions that the trial court erred in denying his motion to suppress identification testimony based on suggestive procedures and violated *Krankel* when it denied his *pro se* posttrial claims of ineffective assistance of counsel, since neither the photographic lineup nor the physical lineup was impermissibly suggestive, defendant was allowed to fully argue his claims of ineffective assistance of counsel and his counsel was allowed to respond to each of defendant's allegations, and the court conducted an adequate inquiry into the allegations. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-15330; the Hon. Carol A. Kipperman, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Sean Collins-Stapleton, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE HOWSE delivered the judgment of the court, with opinion.

Justices J. Gordon and McBride concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant Robert Jones was convicted of two counts of armed robbery following a bench trial and was sentenced to two concurrent 45-year prison terms; 30 years for armed robbery plus an additional 15-year firearm enhancement. On appeal, defendant contends that: (1) the trial court improperly denied his motion to suppress identification testimony because the pretrial identification procedures were suggestive and violated due process and (2) the trial court failed to properly evaluate defendant's *pro se* posttrial claims of ineffective assistance of counsel, as required under *People v. Krankel*, 102 Ill. 2d 181 (1984). Additionally, in his reply brief, defendant contends that his 15-year firearm enhancement violates the proportionate penalties clause of the Illinois Constitution. For the reasons that follow, we affirm defendant's convictions and vacate his sentences.

¶ 2                          BACKGROUND

¶ 3 Defendant was charged with two counts of armed robbery after two eyewitnesses separately identified him in a photo array and one of the witnesses identified him in a lineup as the gunman involved in the armed robbery of a nail salon located in Hillside, Illinois. Defendant filed a motion to suppress the identifications prior to trial, contending that they were obtained through suggestive police procedures.

¶ 4 At the hearing on his motion to suppress, defendant testified that he was arrested on May 24, 2004, and placed in two lineups the following day. During the first lineup, defendant was number two. He stated that police told the lineup participants to individually approach the viewing window and turn around before returning to the line. According to defendant, when it was his turn, a detective called out his name, smiled, laughed, then told defendant to approach the window and turn around two times. Defendant stated he was the only participant asked to turn around more than once. Defendant further testified that during the second lineup, he was number four. During that lineup, although the police did not call out his name, he was again told to approach the window and turn around twice. Defendant stated that during both lineups, he was the last person to join the other participants. Defendant also

-2-

testified that prior to the first lineup, he was told he had a phone call, which he thought was from one of his relatives. When defendant took the phone, however, it was not one of his relatives. Defendant testified that he thought "maybe they got a victim or somebody" on the phone in order to hear his voice before the lineup and that the police "[fell] out laughing" when he picked up the phone.

¶ 5 Hillside police detective Carlo Viscioni was called briefly as a witness by the defense. He testified that on April 29, 2004, he separately showed a five-person photo array to victims Valeria Peeples and Kemia Green. Detective Viscioni first showed the photos individually and then as a group. He further testified that he was involved in physical lineups which included defendant on May 25, 2004. The witnesses viewed the lineups separately and they identified defendant. Viscioni testified that defendant was not treated any differently than the other lineup participants.

¶ 6 On cross-examination, Viscioni testified that the Bellwood police department composed the physical lineups. He did not remember who was in the room with the lineup participants, but he was standing behind the glass with another detective and the witnesses. He did not hear anyone say defendant's name during the lineups or laugh at defendant. Viscioni further stated that he separately showed the photo array to Peeples and Green on April 29, 2004, and they were not allowed to view the backs of the photos, which contained identification information.

¶ 7 On redirect, Detective Viscioni explained that defendant's picture was included in the photo array because he had received information from a codefendant that implicated defendant in the armed robbery.

¶ 8 After hearing argument from defendant and the State, the trial court found that Detective Viscioni was more credible than defendant and that there was no improper police conduct in conducting the lineups. Regarding defendant's argument that the lineups were suggestive merely because he was wearing a red shirt, the court noted that in the first lineup, everyone was approximately the same height, one person was slightly darker, which made him stand out, and that number one was wearing a green shirt, which also stood out. In the second lineup, the court noted that number two was taller than everyone else, that everyone appeared to be approximately the same age and the same race. The court concluded that there was nothing so different about defendant that would lead the witnesses to pick defendant from the group. Defendant's motion to suppress was denied, and the matter proceeded to trial.

¶ 9 At trial, Detective Viscioni testified that at approximately 6:45 p.m. on April 23, 2004, he and his partner responded to an armed robbery call at a nail salon in Hillside, Illinois. He spoke with witnesses on the scene and later at the police station, including Valeria Peeples, Kemia Green, Har Pham, Kim Pham and a juvenile, Alesha Washington. At the salon, Viscioni sat down with the victims, obtained suspect information and completed a composite photo of the offender. The victims identified the gunman as an African-American male having short hair, and in his mid-20s. After subsequently speaking with a suspect in another robbery at a Chicago police station, Viscioni began to search for defendant in connection with the salon robbery. He obtained arrest photos of defendant and placed them in a photo array to be viewed by witnesses and victims. Viscioni was subsequently in contact with

defendant at the Bellwood police station on May 25, 2004. On cross-examination, Viscioni stated that the composite photo was based on descriptions from Peeples and Green.

¶ 10    Kemia Green testified that she and Peeples stopped at the nail salon on April 23, 2004, and were waiting for service when two African-American men entered the salon. At the time, Green was sitting with her feet in a pedicure bowl, facing the door. The gunman was closest to the door, but he was the one doing most of the talking. The gunman ordered everyone to lie down on the floor and everyone complied. Green was able to see the gunman's face when he entered the salon and after she lay on the floor. The men then told them to remove their jewelry, and give them their money and anything that they had. Green indicated that she tilted her head to look at the gunman's face every time he spoke before turning back toward the floor. According to Green, the gunman pointed the gun at everyone in the salon, and she identified defendant in court as the gunman. Green gave her necklace, ring, cellular phone and cash to the second man. The second man told Green and Peeples to roll over onto their backs and Green was able to again see defendant's face clearly as he stood near the door. Green testified that the entire incident took approximately five minutes. After the men left, the salon owners called the police. Green spoke with police and gave a general description of the gunman. She was subsequently called to the Bellwood police station to view a photo array, which she identified in court. She viewed the photos alone and stated that she identified defendant from one of the photos as the gunman from the salon, and again identified defendant in court as the gunman. On redirect examination, Green stated that although the photo of defendant that she picked from the photo array did not have hair, she was able to identify defendant because of his nose.

¶ 11    Valeria Peeples' testimony was substantially similar to Green's regarding the events surrounding the robbery at the nail salon, except that her back was facing the door as she was seated at a manicure station. She and Green were talking when two men entered the salon and said "it's a stick up." Peeples turned around when she heard those words, and then defendant, whom she identified in court, ordered everyone to get on the floor and take out their money and take off their jewelry. She also saw that defendant had a gun. Peeples was able to see defendant from head to toe several times during the incident, and she heard defendant say "if you don't take off everything you have, you try to hide anything, I'll pop you." Peeples surrendered her jewelry and her purse along with its contents. When the police arrived, she gave a description of the gunman as an African-American male with a low fade haircut. A few days later, she was asked to go to the Bellwood police station, where she viewed a photo array alone. Peeples identified a person in one of the photos as the gunman, whom she again identified in court as defendant. Peeples further testified that on May 25, 2004, she was asked to go to the Bellwood police station again to view a lineup. Peeples viewed the lineup alone and she recognized defendant as the gunman. She then again identified defendant in court as the gunman. On cross examination, when questioned as to whether she was looking for an individual with a low fade haircut during the photo and physical lineups, Peeples indicated that she was not only looking at the hair. On redirect examination, Peeples stated that although the hair was different during the lineups, she could identify defendant because she "got a good look at him several times, and the first thing [she's] always remembered, *** he's a nice-looking guy, why is he doing this. That stayed

in [her] head." Peeples further stated that she remembered his nose and recognized his face even though the hair was different.

¶ 12    Detective Viscioni was again called to testify for the State, stating that after defendant was named as a possible suspect, he obtained a photograph and put it within a photo lineup which was shown separately to Peeples and Green on April 29, 2004. Both victims signed lineup photo spread advisory forms prior to viewing the photographs, and defendant's name was added to the forms after both victims identified him. Viscioni identified defendant in court as the same individual that both Peeples and Green identified from the photos. According to Viscioni, neither victim had any difficulty identifying defendant from the photos and both did so rather quickly, even though it was admittedly an old photo of defendant. Viscioni further testified that the investigation continued and on May 25, 2004, a physical lineup was conducted and viewed by Peeples and she identified defendant as the gunman. Once defendant was identified from the lineup, he was arrested and charged with armed robbery.

¶ 13    On cross-examination, Viscioni admitted that defendant was the only person in the lineup who was also in the photo array. He further stated that the composite sketch was not used to put together the photo array and that the victims were always kept separate during the lineup process.

¶ 14    Both sides rested after the admission of exhibits. The trial court began by noting that the main issue in the case was identification. Regarding the identification testimony of Green and Peeples, the court noted that they both had a three- to four-minute period to view defendant and both witnesses testified that every time he spoke, they turned to look at him. The court specifically found that the witnesses gave more than adequate attention to defendant during the robbery before turning to the lineup procedures. The trial court noted that neither witness had a problem picking defendant from the seven-year-old photo in the photo array and the lineup, even though he had no hair. The court further noted that the only thing that had not changed based on the photo array and the photo of the physical lineup was defendant's face, and the witnesses identified him. Regarding the composite sketch, the court noted that it was not a good likeness of defendant and that neither witness adopted it as a complete description of defendant. The court concluded that the identification of defendant from the photo array and the lineup was clear and found defendant guilty of both counts of armed robbery.

¶ 15    Prior to the sentencing hearing, defendant's counsel presented a motion for new trial. Additionally, defendant filed a *pro se* motion for ineffective assistance of counsel. The court denied the motion for new trial and proceeded to defendant's *pro se* motion.

¶ 16    On his own behalf, defendant stated that he wanted his parole officer and family members called as witnesses, which was not done. Additionally, defendant complained that he was never able to review the records for his case and that his various attorneys did not visit or consult with him during the case. He also questioned why his attorney did not subpoena the owners of the salon because their testimony before the grand jury contradicted that of the witnesses at trial, and he kept referring to the witnesses' testimony that he had a "Mohawk" when he has never had hair. Defendant further remarked about the use of codefendant's statements at trial and stated that he did not have a fair trial.

¶ 17	In response to defendant's allegations, one of defendant's attorneys responded that defendant was previously represented by two prior attorneys, one of whom retired and one who became ill. One of the current attorneys, who was then chief of the division, agreed to cocounsel the case and subsequently found a new cocounsel, and they jointly represented defendant at trial. Counsel stated that she did not subpoena the salon owners because their testimony would not have helped defendant and noted that they were not the complaining witnesses. Regarding the posttrial motion, counsel indicated that she filed it because of her belief that the court made an error in the denial of the motion to suppress and further noted that she cross-examined both witnesses about the gunman's nose. Defense counsel corrected defendant's allegations that the witnesses testified that the gunman had a "Mohawk," and that codefendant's statement came in, noting that there was a motion *in limine*. Defense counsel further noted that defendant has consistently expressed a lack of understanding as to how the police could get probable cause based on codefendant's statement. Counsel also stated that she and cocounsel had visited defendant several times in jail and stated that he was not entitled to his file, although he was allowed to go through each page of each file. When asked by the trial court why the parole officer was not subpoenaed, counsel replied that there are photos of defendant with hair, the officer was not an expert, and she further stated that she could not subpoena information that did not exist.

¶ 18	The trial court subsequently denied defendant's *pro se* motion for ineffective assistance and the matter proceeded to sentencing.

¶ 19	After hearing evidence in aggravation and mitigation, defendant was sentenced to concurrent 30-year terms for armed robbery plus 15-year sentence enhancements based on his use of a firearm. This timely appeal followed.

¶ 20	ANALYSIS

¶ 21	On appeal, defendant contends that: (1) the trial court improperly denied his motion to suppress identification testimony because the pretrial identification procedures used for the photo and physical lineups were suggestive and violated due process; and (2) the trial court failed to properly evaluate defendant's *pro se* posttrial claims of ineffective assistance of counsel, as required under *People v. Krankel*, 102 Ill. 2d 181 (1984). Additionally, in his reply brief, defendant contends that his 15-year firearm enhancement violates the proportionate penalties clause of the Illinois Constitution.

¶ 22	Motion to Suppress

¶ 23	Defendant first contends that suggestive identification procedures violated his due process rights. Specifically he claims that the trial court erred denying his motion to suppress the identification testimony by the State's witnesses because it was unreliable due to the suggestive police procedures used.

¶ 24	On a motion to suppress, the defendant bears the burden of establishing that, within the totality of the circumstances, the pretrial identification was so unnecessarily suggestive that it gave rise to a substantial likelihood of an unreliable identification. *People v. Denton*, 329 Ill. App. 3d 246, 250 (2002). Individuals selected for a lineup need not be physically

identical. *Denton*, 329 Ill. App. 3d at 250. "Differences in their appearance go to the weight of the identification, not to its admissibility." *Denton*, 329 Ill. App. 3d at 250. Factors relevant to determining the reliability of a lineup include: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the level of certainty demonstrated by the witness at the time of the lineup; (5) the length of time between the crime and the lineup; and (6) any acquaintance the witness had with the suspect prior to the crime. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). These factors are to be weighed against the alleged corrupting circumstances of the identification procedure. *Denton*, 329 Ill. App. 3d at 250. The trial court's ruling on a motion to suppress will not be overturned on review unless it is manifestly erroneous. *People v. Melock*, 149 Ill. 2d 423, 432 (1992).

¶ 25　　Based on our careful review of the record, we reject defendant's contention that the photo lineup and physical lineup were impermissibly suggestive. Detective Viscioni testified that defendant's photo was added to a photo lineup after he was implicated as a suspect in the robbery. As the court noted in ruling on the motion, there was nothing so different about defendant during any of the lineups that would lead the witnesses to pick him out. The court specifically noted that others in the lineups had more outstanding characteristics than defendant. With regard to defendant's red shirt worn during the physical lineup, which could be considered suggestive, we consider the reliability factors as set forth above and note the following: both witnesses gave physical descriptions of the gunman to the police immediately following the robbery as they both had the opportunity to view him during the robbery; both gave similar physical descriptions of the gunman; both identified defendant as the gunman from the photo lineup without hesitation even though the photo used was seven years old; and the physical lineup was conducted just over a month after the robbery and neither witness knew defendant prior to the robbery. We further note that another lineup participant wore a green shirt, which makes the fact that defendant wore a red shirt during the lineup even less significant. Weighing defendant's allegation of the suggestiveness of his red shirt against the other reliability factors of the lineup, we find that the identification made from the physical lineup was not tainted. We reach the same result regarding the photo lineup. We conclude that the trial court's denial of defendant's motion to suppress lineup identifications was not manifestly erroneous.

¶ 26　　　　　　　　　Posttrial Allegations of Ineffective Assistance

¶ 27　　Defendant next contends the trial court failed to adequately review his *pro se* posttrial allegations of ineffective assistance of trial counsel, which requires a remand for further proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). He specifically claims that the trial court never determined whether his trial counsel explored his defense as to whether he was bald on the date of the robbery, which would have undermined the witnesses' identification testimony, as they both stated the gunman had hair.

¶ 28　　In *Krankel*, 102 Ill. 2d at 187, the defendant's trial counsel did not contact an alibi witness or present an affirmative alibi defense at trial, and defendant raised a *pro se* challenge to his attorney's competence at trial. Our supreme court held that the trial court

should have appointed alternate counsel to represent defendant at the posttrial hearing regarding his claim of ineffective assistance. *Krankel*, 102 Ill. 2d at 189. In *People v. Nitz*, 143 Ill. 2d 82, 134-35 (1991), the Illinois Supreme Court further interpreted *Krankel*, stating:

> "If the trial court conducts a preliminary investigation of the defendant's allegations and determines them to be spurious or pertaining only to trial tactics, no new counsel should be appointed to represent the defendant. If, however, the defendant's allegations of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue defendant's claims of ineffective assistance of counsel."

¶ 29    In *People v. Moore*, 207 Ill. 2d 68 (2003), the Illinois Supreme Court further explained the procedures that trial courts should use to resolve these posttrial *pro se* claims of ineffective assistance of counsel. Specifically, the court stated that the trial court is not required to automatically appoint new counsel in every case, rather, the trial court should evaluate the factual basis of the defendant's claim. *Moore*, 207 Ill. 2d at 77-78. In order to do that, the trial court can simply ask trial counsel about the circumstances surrounding the claim or ask defendant questions about his claim. *Moore*, 207 Ill. 2d at 78. In the alternative, the trial court can base its determination on its personal knowledge of counsel's performance at trial or on the facial insufficiency of defendant's allegations. *Moore*, 207 Ill. 2d at 79. If a defendant's claim lacks merit or relates only to matters of trial strategy, the trial court may deny the motion without appointing new counsel. *Moore*, 207 Ill. 2d at 78.

¶ 30    Here, defendant's trial counsel prepared and presented a motion for new trial. At the posttrial hearing, defendant presented a *pro se* motion for ineffective assistance of counsel. Defendant was allowed to fully argue his motion and counsel was allowed time to respond to each of defendant's allegations. The trial court inquired as to why the parole officer was not called as a witness to which counsel responded that photos existed showing defendant with hair and that the parole officer was not an expert. We find that the trial court conducted an adequate inquiry into defendant's allegations of ineffective assistance of counsel, consistent with the principles stated by the supreme court in *Moore.* The trial court did not abuse or fail to exercise its discretion and we decline defendant's invitation to remand for a new hearing on his posttrial motion for ineffective assistance of counsel.

¶ 31                              Sentence Enhancement

¶ 32    Finally, defendant contended in his reply brief that the 15-year sentence enhancement for armed robbery with a firearm is unconstitutional and void as it violates the proportionate penalties clause under *People v. Hauschild*, 226 Ill. 2d 63 (2007). Although issues raised for the first time in a reply brief are normally not considered (*People v. English*, 2011 IL App (3d) 100764, ¶ 22), the constitutionality of a statutory penalty may be raised at any time (*People v. Christy*, 139 Ill. 2d 172, 176 (1990)).

¶ 33    Our supreme court has recently revisited the holding in *Hauschild* in *People v. Clemons*, 2012 IL 107821. In *Clemons*, the court considered whether *Hauschild* should be overruled. *Clemons*, 2012 IL 107821, ¶ 1. The court noted that in *Hauschild*, it held that the sentence for armed robbery while armed with a firearm violated the proportionate penalties clause " 'because the penalty for that offense is more severe than the penalty for the identical

-8-

offense of armed violence predicated on robbery with a category I or category II weapon.' " *Clemons*, 2012 IL 107821, ¶ 12 (quoting *Hauschild*, 226 Ill. 2d at 87). The court rejected the State's conclusion that a subsequent legislative amendment to the armed violence statute " '[corrected]' *Hauschild* and 'clarif[ied]' what the legislature considered to be the statute's meaning all along, *i.e.*, that robbery may not serve as a predicate felony for armed violence because armed robbery is an 'enhanced' version of robbery with 'possession or use of dangerous weapon' as an element." *Clemons*, 2012 IL 107821, ¶ 16. In doing so, the court noted that amendment to the armed violence statute was adopted after its interpretation of that statute in *Hauschild* and that its interpretation was part of the armed violence statute at the time the legislative amendment was enacted. *Clemons*, 2012 IL 107821, ¶ 18. The court further noted that while the General Assembly can pass legislation to prospectively change the judicial construction of a statute if it believes that the judicial construction is opposite of the legislative intent, it cannot change that construction by a later declaration of what it originally intended. *Clemons*, 2012 IL 107821, ¶ 18. As such, the court concluded that *Hauschild* remains the law as to the meaning of the armed violence statute prior to its amendment by Public Act 95-688. *Clemons*, 2012 IL 107821, ¶ 19.

¶ 34    We note that the State conceded to defendant's argument during oral arguments.

¶ 35    As stated by our supreme court in *Clemons* during its discussion of *Hauschild*, " 'when an amended sentencing statute has been found to violate the proportionate penalties clause, the proper remedy is to remand for resentencing in accordance with the statute as it existed prior to the amendment.' " *Clemons*, 2012 IL 107821, ¶ 56 (quoting *Hauschild*, 226 Ill. 2d at 88). Accordingly, we vacate defendant's sentences and remand to the trial court for resentencing.

¶ 36                                             CONCLUSION

¶ 37    For the foregoing reasons, we affirm the judgments of the trial court that denied defendant's motion to suppress identification testimony and denied defendant's *pro se* posttrial motion for ineffective assistance of counsel. We vacate defendant's sentences and remand for resentencing.

¶ 38    Affirmed in part and vacated in part; cause remanded.