2020 IL App (1st) 173003-U

No. 1-17-3003

Order filed July 31, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 14 CR 216 |
| TERRELL BROWN, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Dennis Porter, |
| | ) | Judge, Presiding. |

_____

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction and sentence are affirmed where: the eyewitness's in-court identification was proper; pre-trial identification procedures were not unduly suggestive; trial counsel was not ineffective; the evidence was sufficient to support his conviction; and his extended-term sentence of eight years' imprisonment was not excessive.

¶ 2    Following a jury trial, defendant Terrell Brown was convicted of three counts of aggravated battery (720 ILCS 5/12-3(a) (West 2016)), a Class 3 felony, and sentenced to an extended-term of eight years' imprisonment. He appeals, arguing that: (1) the trial court erred when it allowed the State to re-ask the complainant, on direct examination, to identify the offender in open court after

the complainant had testified that the offender was not in court and where the State showed the complainant a photograph of the photo-array and lineup before re-asking him to identify the offender in open court; (2) that the pretrial identification procedures were unduly suggestive and tainted the in-court identification; (3) that trial counsel was ineffective in failing to introduce discrepancies in the complaint's various descriptions of the offender; (4) that the evidence was insufficient to sustain the conviction where there was a single eyewitness who initially testified that the offender was not in court, where the photo-array and lineup were not conducted in compliance with recommended procedures, and where there was a lack of corroborative evidence – e.g., no evidence that the defendant made any incriminating statements and no physical evidence which placed the defendant at the scene of the crime on the date in question; and (5) that his extended-term sentence of eight years was excessive. For the reasons that follow, we affirm defendant's convictions and sentence.

¶ 3                                    BACKGROUND

¶ 4      Defendant was arrested on December 6, 2013, and indicted on December 18, 2013, for the offense of aggravated battery against Akli. A suppression hearing was conducted on October 2, 2014, to suppress defendant's photo-array and physical line-up identification. During the hearing defendant's counsel argued that: the photo-array and physical line-up were unfairly conducted because there were no persons in the photo-array or physical line-up reasonably similar to defendant in physical appearance; the composition and construction of the line-up was such as to improperly suggest the identification of the defendant as the perpetrator of the offense in that there was a significant disparity in certain distinguishing characteristics between defendant and the other individuals in the photo-array and the physical line-up, and there was an inadequate number of subjects presented for comparison; the emotional and physical condition of the witness was such

as to impair his ability to make a fair, rational and reasoned identification of the offender in this case; and the conduct of the police and/or other governmental officials was such as to improperly suggest the identification of the defendant as the perpetrator of the offense. The State presented two detectives during the hearing who testified regarding their procedures during the photo-array and physical line-up. At the conclusion of the hearing, the court stated that the detectives' testimony was straightforward, consistent and credible; the array was conducted two days after the incident occurred; and, the photos were people of the same gender, racial characteristics, hairstyles, almost the same mustache, and "remarkably unsuggestive." Defendant's motion to suppress his identification was denied.

¶ 5    At trial, Akli, a 50-year-old African male taxicab driver, testified on direct examination that at approximately 4:00 a.m. on October 20, 2013, he had just completed his shift and was driving his taxicab to his home in Lyons, Illinois. While stopped at a red light on Western Avenue at Van Buren Street, his cab was rear-ended by a person he later identified as defendant. Akli testified that he grabbed a piece of paper, a pen, and his phone and exited his cab and began writing down the license plate number of the other vehicle. He then took his phone out to call the police. At this time, defendant exited his vehicle and began shouting: "If you call police, I'll kill you. You call police, I'll kill you." Akli described the person as a tall, light-skinned black man, "just a normal person wearing a white T-shirt, and I don't remember the color of the pants." He also described the vehicle as "an old car, Oldsmobile, and the color was light brown."

¶ 6    Akli testified that after he exited his vehicle, he began walking towards the rear of his vehicle and said, "brother, you just hit my car and you want to kill me?" Defendant began walking towards him. After Akli and defendant were "very close," defendant stated that Akli's vehicle was

3

not damaged and he offered Akli a $100 bill, but Akli refused to take it because he felt it was "against the law of insurance" to accept it.

¶ 7     The State then asked Akli to identify defendant in court and Akli stated that he did not see defendant in court.

¶ 8     Akli further testified that as he proceeded to call the police, defendant became angry and began hitting him in his face "so many times." Defendant then jumped in his vehicle and attempted to run Akli over, and Akli jumped to the side to avoid being struck. As defendant was driving away, Akli took a picture of defendant's vehicle. Akli was then presented with the photograph he took of defendant's vehicle on October 20 for identification and the photograph was entered into evidence.

¶ 9     Akli testified that while he and defendant were at the rear of his vehicle, he noticed that he had written down the numbers for defendant's license plate incorrectly but did not correct it at that time because of the "tension." After defendant drove away, he changed the second to last number from a "5" to an "8" and he recorded the plate number as L752588.

¶ 10    Akli testified that after defendant drove off, as he attempted to call the police again, a detective pulled up in a squad vehicle. Akli told the detective that defendant was a 5'8" to 6' tall, light-skinned African-American male, wearing a white t-shirt, and gave the officer the piece of paper with the license plate number on it. The officer questioned Akli about the corrections on the paper, and Akli explained he changed the second to last number from a "5" to an "8." Akli identified the piece of paper with the plate number in court and the document was admitted into evidence. Eventually, an ambulance arrived and transported Akli to Stroger Cook County Hospital (Stroger).

¶ 11    While at Stroger, Akli learned that he had suffered a ruptured globe injury to his left eye, causing permanent blindness in that eye. Removal of the eye was recommended but Akli declined. Akli testified that his sight was perfect prior to the attack and he never had glaucoma.

¶ 12    Akli testified that on October 22, 2013, he went to the police station to view a photo-array of possible suspects. He reviewed and signed a lineup advisory form after a detective explained the purpose of the form and the process. Then, the detective showed Akli a photo collage of six men. Akli identified defendant's photograph as the man who rear-ended and attacked him and stated he was "100 percent sure it was him." Akli signed defendant's photograph. This photo-array was entered into evidence.

¶ 13    Akli testified that on December 6, 2013, he returned to the police station to view a physical lineup. Detective Kolman reviewed a lineup advisory form with him and he signed it. Akli testified that he identified defendant from the lineup as the man who rear-ended and attacked him on October 20, 2013. The photo of the lineup was then introduced into evidence.

¶ 14    After the photo-array and physical lineup photos were introduced into evidence, Akli was asked, again, whether he could identify defendant in court. Akli did. When asked why he failed to identify defendant previously, Akli stated, "[b]efore they move this thing was so -the light was not -- did not permit me to recognize him. When I was sitting there when he stand up, they said okay, let's everybody -- like the jury something, we have to stand up. That is when I noticed it is him."

¶ 15    On cross examination, Akli testified that at the time of the accident, it was dark, and he had previously worked a twelve-hour shift. He testified that there was a little space, approximately two inches, between his vehicle and defendant's vehicle, but he was able to see his license plate number. Akli testified that when defendant was attempting to offer him a $100 bill, he was looking into his eyes as they were conversing. He stated that the entire incident lasted for less than two

minutes. Akli testified that he is 5'8" and described defendant as taller than him and that defendant could have been up to seven inches taller.

¶ 16   On redirect examination, Akli stated that he had to look up when he was speaking with defendant and indicated his height with his hands as approximately 5 inches taller than him.

¶ 17   Des Plaines Police Department Officer Alexander Dunn testified that on July 22, 2013, he stopped a vehicle driven by defendant as part of a routine traffic stop. Officer Dunn identified defendant in court. Defendant was driving a gold 1985 Cutlass Supreme (Oldsmobile) with the license plate number L752588. Officer Dunn learned that defendant lived at 131 Cuyler, Oak Park, Illinois. A photograph of defendant was taken on that date. Defense counsel's objection to the admission of the photograph into evidence was overruled.

¶ 18   Chicago Police officer Nina Moore testified that on December 6, 2013, at approximately 4:55 p.m., she and her partner, Officer Choate, drove to 3360 West Lake Street. Once there, they stopped a vehicle driven by defendant, whom she identified in court. Defendant was driving a gold 1985 Oldsmobile. Officer Moore arrested defendant in part for a minor traffic violation. During the arrest, Officer Moore documented the vehicle's license plate number as S235926. Officer Moore learned that there was an investigative alert for defendant and notified the detective who issued the alert that she had defendant in custody.

¶ 19   Dr. Thomas Patrianakos, an ophthalmologist at Stroger Hospital testified that on October 20, 2013, he examined Akli and performed an open globe exploration and repair surgery on his left eye for a ruptured eye globe. He noticed that Akli's eye had "quite a bit of swelling" and had "no light perception." Dr. Patrianakos testified that Akli also had orbital fractures around his left eye. Akli became blind in his left eye after the incident.

¶ 20    On cross examination, Dr. Patrianakos testified that Akli had a prior cataract extraction in 2011. He stated that he did not know if the extraction was successful because he did not evaluate Akli afterwards. He testified that if a general cataract condition is left untreated or maltreated, it will worsen and could affect night vision.

¶ 21    On redirect examination, Dr. Patrianakos testified that there was no evidence in Akli's records from October 20 that he had glaucoma. He also testified that cataract surgery has probably one of the highest success rates out of all surgeries that can be performed, and the success rate of surgery is about 98 percent.

¶ 22    Investigator Eugene Shepherd, an investigator with the Cook County State's Attorney's Office, testified that on April 27, 2016, he went to a tow truck yard at 4699 West Lake Street in Melrose, Illinois, to take photographs of the 1985 Oldsmobile defendant was driving at the time of his arrest in December of 2013, which had been held in a secure location in the yard. Investigator Shepherd identified the photographs in court. He testified that in July of 2016, he was asked to meet with Akli and recover the piece of paper with defendant's driver's license number written on it. After retrieving the paper, Investigator Shepherd inventoried it, sealed it, and gave it to the vault person at the State's Attorney's Office. He also identified the piece of paper in court.

¶ 23    The State then admitted into evidence a certified vehicle title from the Illinois Secretary of State for the 1985 Oldsmobile coupe with license plate number L752588. The vehicle was registered to a single owner, Bridgette Grissette-Brown, the mother of defendant's daughter, of 131 N. Cuyler, Apartment 313, Oak Park, defendant's address at the time of his July 22, 2013, arrest. The registration reflected that the license plate was replaced on December 5, 2013, with a new license plate, S235926, which is the same license plate number on the vehicle when defendant was arrested the following day, on December 6, 2013.

¶ 24    The State then rested their case-in chief. Defendant moved for a directed verdict of acquittal, which was denied.

¶ 25    The defense, then called defendant's fiancée, Aisha Henison, as an alibi witness. Henison testified that on December 6, 2013, she received a call from a police officer who asked her if she knew defendant. She responded that she did and that he was her fiancé. The officer asked her if she recalled the date of October 20, 2013, and Henison stated that she did not. She also checked her text messages on that date, and she did not find anything. Subsequently, Henison began going through her phone, including pictures of her son attending a homecoming dance on October 19, 2013, the day prior to the accident. Henison testified that she recalled that she, defendant, and her youngest son were helping her older son get dressed and they took pictures. Then, Henison, defendant, her two sons, and defendant's daughter went to her best friend's home because her son was attending homecoming with her best friend's daughter. After they dropped off the children at homecoming at Downers Grove High School, everyone proceeded to a restaurant at approximately 8:00 p.m. At approximately 10:15 p.m., they went back to the high school to pick up their children.

¶ 26    Henison testified that after she picked up her son from homecoming, they all went back home, including defendant, and she and defendant went to bed and stayed in bed until they woke up the next morning.

¶ 27    When defendant woke up the next morning at approximately 9:00 a.m. on October 20, he went to play basketball. Henison testified that there is no possibility that defendant left the house that evening because she is a very light sleeper and would have heard him leave.

¶ 28    On cross examination Henison testified that she told defendant's attorney about the events surrounding her son's homecoming in March of 2017, approximately three years and nine months after defendant was arrested on December 6, 2013, and one month before defendant's trial began.

¶ 29   Following closing arguments, a jury found defendant guilty of aggravated battery causing great bodily harm, aggravated battery on a public way, and aggravated battery causing permanent disability. The trial court denied defendant's motion for a new trial, reasoning that Akli had an adequate opportunity to observe defendant because "they were face-to-face, close enough for the victim to lose sight in one of his eyes from the assault that he received." Further, the court held that the testimony of a single eyewitness is sufficient to convict if believed, and the believability of the witness was a matter for the jury, which decided against defendant. The court also held that the question of the reliability of the in-court identification was a matter of fact for the jury, and the jury observed the in-court identification, the manner of said identification, and were properly instructed on the identification.

¶ 30   During the sentencing hearing, the State then called a witness in aggravation, Cook County Deputy Sheriff Anthony Kolaski. Sheriff Kolaski testified that on May 4, 2008, at approximately 4:34 p.m. he was driving near 4359 North Linder, Chicago, Illinois. He was off-duty and driving home with his fiancée and nine-year-old stepdaughter. He pulled up to the light in the left lane and a vehicle pulled up next to him. The light turned green and the other vehicle took off and cut into his lane. Sheriff Kolaski then pulled back into the right lane to avoid hitting the other vehicle and was trying to catch up to the vehicle to see the license plate number. While his fiancée was writing down the license plate, the person in the other vehicle jammed on the brakes, so Sheriff Kolaski stopped to avoid running into the back of the other vehicle. Sheriff Kolaski testified that the driver, who was later identified as defendant, stepped out of the vehicle, walked between the two vehicles and said something like "you white b****," to Sheriff Kolaski's fiancée, who was sitting in the passenger seat, and began walking towards her.

9

¶ 31    Sheriff Kolaski testified that defendant then began to reach inside the passenger side of the vehicle, so he got out and walked around the front of his vehicle and said to defendant, "[s]top, I'm the police. We don't need any of this going on. Just get back in your car" and showed defendant his badge. Defendant then walked over to Sheriff Kolaski, said "[f]*** the police," and hit him in the head. Sheriff Kolaski fell to the ground and as he attempted to stand back up, defendant hit him in the head again.  Sheriff Kolaski and defendant began fighting and they both ended up in front of defendant's vehicle. Defendant then "jumped into his car, closed the door and floored it," hitting Sheriff Kolaski with his vehicle. Defendant then sped down the street with Sheriff Kolaski holding onto the hood. Defendant slammed on the brakes, and Sheriff Kolaski went "flying off the hood of the car," hitting his head on the ground. Defendant then exited his vehicle and started kicking and punching Sheriff Kolaski while he was on the ground in front of his vehicle, telling him "fuck the police."

¶ 32    Meanwhile, Sheriff Kolaski's fiancée pulled Kolaski's vehicle, a Hummer, in between defendant's vehicle and Sheriff Kolaski, who was still on the ground. Defendant got back into his vehicle, "floored it", and tried to move the Hummer out of the way but could not. Defendant tried to back up but was unable to do so because there were other vehicles behind him. Defendant got out of his vehicle and hit Sheriff Kolaski a few more times before running away.

¶ 33    Sheriff Kolaski testified that after defendant ran away, he heard sirens. The police then returned to the scene of the incident with defendant. Sheriff Kolaski identified defendant as the person who had just struck him, and his fiancée took him to the hospital. Defendant was subsequently found guilty of aggravated battery, great bodily harm in that case and was sentenced on March 4, 2009, to 42 months' imprisonment in the Illinois Department of Corrections.

¶ 34    Defense had letters in mitigation from professionals in the community, friends, and family members, who talked about defendant's rehabilitation leading up to this case. Defense presented a certificate of recognition from the Christ Centered Life Learning Ministry, a bible group defendant completed, and indicated that he had a history of gainful employment in heating, air conditioning and ventilation.

¶ 35    After considering aggravation and mitigation evidence in the current case, the trial court sentenced defendant to an extended term of eight years' imprisonment. The court found this sentence to be necessary "to avoid deprecating the seriousness of [the] offense" and "for the rehabilitation of the defendant." The court found "it particularly aggravating that this [was] exactly the same type of offense he committed in 2008, a road rage incident." The trial court further stated that it was fully prepared to give defendant the maximum sentence but did not "in view of the mitigation…presented."

¶ 36    Defendant filed a motion to reconsider his sentence, which was denied. Defendant now appeals his conviction and sentence.[1]

¶ 37                              ANALYSIS

¶ 38                    A. In-Court Identification

¶ 39    Defendant first contends that the trial court erred when it allowed the State to use a photograph of the live line-up to prompt Akli's in-court identification of defendant after Akli was initially unable to identify defendant in court. Defendant contends that this was an unduly suggestive method of identification.

---

[1] This case was fully briefed on September 9, 2019, and assigned to the authoring justice's inventory of cases on September 10, 2019.  The authoring justice first circulated a proposed disposition to Justice Hoffman and Justice Rochford on July 22, 2020.

¶ 40    The State responds that Akli explained that he could not identify defendant the first time he was asked because he could not see him due to the obstruction in his way and the lighting conditions in the court room, not that he failed to remember what defendant looked like. It also contends that whether Akli's explanation was convincing was a question of fact for the jury.

¶ 41    First, we disagree with defendant's position that this issue is subject to a *de novo* standard of review. We review the trial court's evidentiary ruling on whether to admit particular testimony for an abuse of discretion. *People v. Tenney,* 205 Ill. 2d 411, 436 (2002); *People v. Evans*, 2016 IL App (3d) 140120, ¶ 28; *People v. Calderon*, 369 Ill. App. 3d 221, 231 (2006). Our supreme court has held that an in-court identification of a defendant, on its own, does not violate due process. *People ex rel. Blassick v. Callahan,* 50 Ill. 2d 330, 334–35 (1972); see also *People v. Rodriguez,* 134 Ill. App. 3d 582, 589 (1985) (absent extrajudicial suggestiveness, suggestiveness at trial does not offend due process because the trial itself, especially the ability for cross-examination, affords the defendant adequate protection); *People v. Patterson,* 88 Ill. App. 3d 168, 176 (1980) (the "prosecution is not required to fill the courtroom with individuals who resemble the defendant in order to insure a proper identification").

¶ 42    When a reviewing court assesses the reliability of an identification, relevant factors it considers are the opportunity of the witness to view the offender at the time of the crime, the witness' degree of attention, the witness' description, the level of certainty demonstrated by the witness at the confrontation and the length of time between the crime and the confrontation. *People v. Holmes,* 141 Ill. 2d 204 (1990); *People v. Slim*, 127 Ill. 2d 302 (1989). An identification requires exclusion if it is caused by impermissible suggestiveness which gives rise to the substantial likelihood of irreparable misidentification. *People v. Robinson*, 299 Ill. App. 3d 426, 434 (1998); *People v. Lutz,* 103 Ill. App. 3d 976, 983 (1982).

¶ 43    Applying the factors in the instant case, Akli testified that he was initially unable to identify defendant in court because something was obstructing his view. The trial court determined that Akli's testimony was credible and admitted his subsequent identification over defense counsels' objection. The record reflects that Akli had ample opportunity to observe defendant and was able to describe him with sufficient detail within days of the altercation. Akli testified that during his interaction with defendant on October 20, 2013, he was able to see defendant's face and was very close to him as defendant attempted to offer him $100 to repair any damage to his taxicab, right before defendant punched him in his left eye. Akli provided a detailed description of defendant and he never wavered in his statements that defendant was between 5'8" and 6" and light-skinned.

¶ 44    In addition, contrary to defendant's contention, the witness' memory did not require refreshing. Akli did not forget what occurred or how defendant looked. Akli testified that he was unable to see defendant initially in court because his view was obstructed.

¶ 45    Defendant further contends that Akli's prior identification was not corroborative of his in-court testimony. First, we agree with the State that pursuant to section 115-12 of the Illinois Code of Criminal Procedure (725 ILCS 5/115-12 (West 2016)), "a statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." Akli's out of court statement was substantively admissible. See *People v. Holveck*, 141 Ill. 2d 84, 104 (1990) (an in-court identification to corroborate an out-of-court identification is unnecessary; under the plain language of the statute, an in-court identification is no longer required). Second, this argument is irrelevant because Akli did make in an in-court identification of defendant. The jury heard Akli's testimony and considered Akli's subsequent ability to identify defendant in court despite his initial inability

13

to do so. Therefore, Akli's in-court identification of defendant was proper and the trial court did not abuse its discretion by allowing Akli's in-court identification of defendant.

¶ 46    Defendant relies on two out-of-state cases in support of his argument that Akli was allowed to "take a second bite at the apple" and "try again" to make an in-court identification of defendant, which was unduly suggestive. Not only are these cases unpersuasive authority, but they are inapposite to the facts in this case. In *Commonwealth v. Mims*, 481 Pa. 275, 282 (1978), after a trial judge questioned a witness who was unable to make an in-court identification of a defendant, the appellate court determined that the "court below improperly injected itself into the proceeding" and the "procedure was unduly suggestive." In *Hamilton v. State*, 303 So. 2d 656 (1974), a witness originally selected the defendant from a photo-array. Four days later she expressed doubt and asked to see the photos again and eventually chose a different person. *Id.* The court determined that the police officer's suggestion to a witness that "she had selected the right photograph on the first occasion and suggested that she try again" was "impermissibly suggestive." *Id*. at 657.

¶ 47                          B. Pre-trial Identification Procedures

¶ 48    Defendant's second contention on appeal is that the trial court erred when it denied his motion to suppress Akli's out of court identifications of defendant because the pretrial identification procedures were unduly suggestive and tainted the in-court identification. We disagree.

¶ 49    When challenging the propriety of pretrial identification procedures, defendant bears the burden of proving that the procedure was unnecessarily suggestive and created a substantial likelihood of misidentification. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 95 (citing *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39). The State may rebut defendant's showing by "clear and convincing evidence that the witness is identifying the defendant based on his or her

independent recollection of the incident." *Id.* (citing *People v. Brooks*, 187 Ill. 2d 91, 126 (1999)). Courts look to the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification. *Id.* (citing *Lawson*, 2015 IL App (1st) 120751, ¶ 39). The reviewing court may also consider the evidence presented at trial as well as the suppression hearing. *Id.* Where the challenged identification procedure is a photo-array or lineup, individuals selected for the array or lineup need not be physically identical. *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007). Differences in the appearances of the participants go to the weight of a witness's identification, not to its admissibility. *People v. Jones*, 2012 IL App (1st) 100527, ¶ 24. A trial court's factual determination that an identification procedure was not unduly suggestive should not be reversed unless it is against the manifest weight of the evidence. *People v. Gaston*, 259 Ill. App. 3d 869, 876 (1994).

¶ 50     The court employs a two-prong test to determine whether a witness's identification was so tainted by suggestive identification procedures that its admission at defendant's trial violated due process. *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 22 (citing *People v. McTush*, 81 Ill. 2d 513, 520-21 (1980)). First, the court must determine whether the pretrial identification procedures were suggestive; if so, then the court must determine whether the identification testimony was so tainted as to make it unreliable. *Id.* In evaluating the reliability of the tainted identification, the court considers (1) the witness's opportunity to view the suspect during the offense, (2) the witness's degree of attention, (3) the accuracy of any prior descriptions given, (4) his level of certainty at the time of the identification, (5) the length of time between the crime and the identifications, and (6) any prior acquaintance with the person identified that would enhance the witness's ability to recognize him. *Id.* at 521.

¶ 51    First, as the State points out, section 725 ILCS 5/107A-2 (West 2012), which became effective in January of 2015, was not the governing provision at the time the photo-array identification took place in this case. This court has declined to retroactively apply section 5/107A-2 to cases involving photo-array identifications prior to its enactment and we decline to apply it in this case. See *Corral*, 2019 IL App (1st) 171501, ¶ 96. As such, we will address this issue through the lens of the applicable statute, section 5/107A-5 (725 ILCS 5/107A-5 (West 2012)), and the portion of defendant's argument which relies on section 5/107A-2 will be disregarded.

¶ 52    Section 5/107A-5, which was in effect in 2013, provides in relevant part that:

> "(a) All lineups shall be photographed or otherwise recorded. These photographs shall be disclosed to the accused and his or her defense counsel during discovery proceedings…All photographs of suspects shown to an eye-witness during the photo spread shall be disclosed to the accused and his or her counsel during discovery proceedings…(b) Each eyewitness who views a lineup or photo spread shall sign a form containing the following information: (1) The suspect might not be in the lineup or photo spread and the eyewitness is not obligated to make an identification. (2) The eyewitness should not assume that the person administering the lineup or photo spread knows which person is the suspect in the case. (c) Suspects in a lineup or photo spread should not appear to be substantially different from "fillers" or "distracters" in the lineup or photo spread…" (West 2013)

¶ 53    Defendant does not argue that the steps delineated in section 5/107A-2 were not followed. In fact, when evaluated pursuant to section 5/107A-2, our review of the record reveals that the trial court's determination that the identification techniques utilized in this case were not unduly suggestive is not against the manifest weight of the evidence. The trial court stated that after carefully reviewing all the evidence, there was nothing in the record which indicated that the photo array or the lineup presented to Akli were suggestive.

¶ 54    Regarding the photo-array process, the trial court stated that the detective's testimony at the suppression hearing was straightforward, consistent and credible; the array was conducted two days after the incident occurred; and, the photos were people of the same gender, racial

characteristics, hairstyles, almost the same mustache, and "remarkably unsuggestive." See *Ortiz*, 2017 IL App (1st) 142559, ¶ 25 (no error in the trial court's denial of defendant's motion to suppress because the pretrial procedures were not unduly suggestive; review of both the photo array and the photograph of the lineup contained in the record confirmed that all the men were similar in appearance). We agree with the trial court.

¶ 55    Also, defendant's contention that Akli's testimony suggested that defendant may have stood out in the photo-array because of his complexion, is perplexing. It is true that two police reports described defendant as having "dark complexion" and "medium complexion," and a detective who prepared the photo-array testified that defendant was described as having a "brown complexion." However, placing other photos in the array with the same complexion as defendant is actually required by section 5/107A-5(c), which states, "c) Suspects in a lineup or photo spread should not appear to be substantially different from "fillers" or "distracters" in the lineup or photo spread…" The police officer included photos that matched defendant's complexion to avoid a violation of the statute and render the array unduly suggestive.

¶ 56    Regarding the lineup procedures, the court determined that the testimony of the detective who conducted the lineup, six weeks after the incident, was also straightforward, consistent, and credible. The detective informing Akli that there was a "possible suspect" in custody, does not, in and of itself, render the lineup procedures unduly suggestive or render it tainted. The record reflects that although the officers asked Akli to come to the station because they had a possible suspect, when he arrived, they presented him with a lineup advisory form, which they explained in detail. The officer explained that Akli was not required to make an identification, that defendant may or may not be in the lineup, and that Akli did not assume that the person administering the lineup knew which person was the suspect. See *People v. Johnson*, 123 Ill. App. 3d 1008, 1013 (1984)

17

(fact that the witnesses knew the suspects were in the lineup is not suggestive *per se* but is merely stating the obvious) (citing *People v. Madden* 52 Ill. App. 3d 951 (1977)).

¶ 57    In addition, defendant contends that he was the only person who wore a coat or other outerwear during the lineup, which "suggests that a person has been inside longer – presumptively in the police station – than others who were wearing a coat." The law does not require the participants in a lineup to be nearly identical, nor to exactly match the descriptions given by eyewitnesses. *People v. Love*, 377 Ill. App. 3d 306, 311 (2007). The suggestibility of a lineup depends on " 'the strength of the suggestion made to the witness' " and, whether, through " 'some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities.' " *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (quoting *People v. Johnson*, 149 Ill. 2d 118, 147 (1992)) (lineup not overly suggestive where the defendant was the only one wearing a white T-shirt); *People v. Peterson*, 311 Ill. App. 3d 38, 49 (1999) (lineup not unduly suggestive when the defendant was the only one present wearing a gray sweatshirt); and *People v. Faber*, 2012 IL App (1st) 093273 (lineup not suggestive where the defendant was the only participant wearing a sleeveless t-shirt a witness described the offender as wearing). Courts must examine the totality of the circumstances in determining whether a defendant has met the burden of showing the identification procedure was impermissibly suggestive. *People v. Prince*, 362 Ill. App. 3d 762, 771 (2005). If a defendant satisfies this burden of proof, only then will the burden shift to the State to show, by clear and convincing evidence, an independent basis of reliability for a later identification. *Id.*

¶ 58    There is nothing in the record which supports the conclusion that the individuals in the lineup were required to wear a particular item of clothing. Furthermore, like the aforementioned cases, defendant's lack of a coat did not render the lineup unduly suggestive. Defendant cannot

claim improper influence here where he simply wore his own clothing in the lineup. *People v. Jonson*, 149 Ill. 2d 118, 147 (1992).

¶ 59    Also, defendant's contention that the fact that he was the only person in both the photo-array and the physical lineup renders the lineup unduly suggestive is unsupported by Illinois law. The mere fact that defendant was the only person in both the photo-array and the lineup does not render the lineup suggestive. *Id.* at 148; *Ortiz*, 2017 IL App (1st) 142559, ¶ 26.

¶ 60    Based upon the totality of the circumstances, we find that the pretrial identifications were not unduly suggestive. Therefore, we need not determine whether these identifications tainted the in-court identification testimony.

¶ 61                                C.  Ineffective Assistance of Counsel

¶ 62    Defendant next contends on appeal that his trial counsel was ineffective for failing to introduce discrepancies in Akli's various descriptions of defendant.

¶ 63    An ineffective assistance of counsel claim "is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Henderson*, 2013 IL 114040, ¶ 11. To show ineffective assistance, a defendant must show both that "counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. "A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *Id.* Whether a defendant sufficiently alleges ineffective assistance of counsel is a legal question subject to *de novo* review. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 64    We can dispose of defendant's assertion of ineffective assistance of counsel on either prong, and we find that defendant has failed to satisfy the first prong.

¶ 65    With ineffective assistance of counsel claims, a court accords much deference to defense "counsel's judgment and strongly presumes that counsel's conduct falls within the wide range of reasonable professional assistance." *People v. Richardson*, 189 Ill. 2d 401, 413 (2000). "Generally, the decision of whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). Our supreme court has explained that "[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Pecoraro*, 175 Ill. 2d at 326-27. Accordingly, a "[d]efendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *Pecoraro*, 175 Ill. 2d at 327.

¶ 66    Defendant points to three instances where he believed trial counsel should have introduced evidence of the inconsistencies between Akli's trial testimony and his prior statements: (1) inconsistencies regarding Akli's description of defendant as having dark complexion prior to the trial and light complexion during trial; (2) police reports indicating the use of a weapon and no mention of a weapon during trial; and (3) inconsistencies regarding defendant's age. However, we cannot say that trial counsel's professional judgment on how to cross-examine Akli regarding these matters resulted in ineffective assistance.

¶ 67    The record reflects that trial counsel questioned Akli's description of defendant's complexion on cross-examination. Specifically, counsel asked if Akli gave a description to the police that the person who had assaulted him "had a dark complexion," and Akli responded, "[t]hat is not correct." Counsel then followed up with, "[s]o what complexion did they have," and Akli responded, "[l]ight skin." Also, counsel's decision to refrain from addressing whether Akli was hit with a weapon or defendant's age may have been a matter of trial strategy. Although the jury may

not have been aware of what caused Akli's injuries, it was certainly aware that defendant had struck Akli with something so hard that it broke his eye socket and rendered him completely blind in his left eye.

¶ 68    The record also reflects that trial counsel thoroughly defended defendant and cross-examined the eyewitness. Trial counsel objected to the introduction of the piece of paper containing defendant's license plate into evidence, the form Akli signed related to the lineup procedures, and the identification of defendant in the lineup. Counsel also thoroughly cross-examined Akli regarding the details of the occurrence, including the lighting, the timeframe from the beginning to the end of the altercation, his ability to view the defendant, his ability to see defendant's license plate; defendant's height, and the subsequent change Akli made to the piece of paper. Moreover, during a sidebar, trial counsel requested that the trial court specifically ask the State's Attorneys whether they had engaged in conversation with Akli during the lunch break.

¶ 69    Accordingly, defendant has not shown that counsel's approach to cross-examination was objectively unreasonable. See *Pecoraro*, 175 Ill. 2d at 327, 677 N.E.2d at 891. Based upon the foregoing, we cannot say that trial counsel's assistance was ineffective.

¶ 70                      D.  Sufficiency of the Evidence

¶ 71    Defendant further contends that the evidence was insufficient to sustain his conviction. Defendant argues that Akli was a single eyewitness who initially testified that the offender was not in court, that the photo-array and lineup were not conducted in compliance with recommended procedures, and that there was a lack of corroborative evidence – e.g., no evidence that the defendant made any incriminating statements and no physical evidence which placed the defendant at the scene of the crime on the date in question.

¶ 72    The State responds that Akli's identifications of defendant were reliable and credible and were independently corroborated by defendant's connection to the vehicle used in the attack.

¶ 73    Defendant's contentions related to the photo-array and lineup were addressed previously and will not be readdressed here.

¶ 74    When reviewing a challenge to the sufficiency of the State's evidence, the reviewing court considers the evidence in the light most favorable to the State to determine whether "any rational trier of fact could have found the required elements beyond a reasonable doubt." *People v. Newton*, 2018 IL 122958, ¶ 24. "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 75    As witness credibility is a matter for the trier of fact, it may accept or reject as much or little of a witness's testimony as it chooses. *People v. Peoples,* 2015 IL App (1st) 121717, ¶ 67. The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances; instead, it is sufficient if all the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *In re Jonathon C.B.,* 2011 IL 107750, ¶ 60. The trier of fact is not required to disregard inferences that flow normally from the evidence, nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt, nor to find a witness was not credible merely because the defendant says so. *Jonathon C.B.,* 2011 IL 107750, ¶ 60. The trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Hutchinson,* 2013 IL App (1st) 102332 ¶ 27; *People v. Ortiz,* 196 Ill. 2d 236, 259 (2001). The reviewing court "will not reverse a criminal conviction unless the evidence is so unreasonable,

improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Campbell*, 146 Ill. 2d 363, 375 (1992).

¶ 76    In this case, defendant was found guilty of aggravated battery. Section 12–3.05(c) of the Illinois Criminal Code  states that:  "[a] person commits aggravated battery when, in committing a battery, other than by discharge of a firearm, he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement * * *." 720 ILCS 5/12–3.05(c) (West 2016). "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2016). To establish that defendant committed aggravated battery, the State must prove each element of the offense beyond a reasonable doubt. *People v. Cherry*, 2016 IL 118728, ¶ 16; *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

¶ 77    The positive and credible testimony of a single witness is sufficient to convict, even if contradicted by the defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. Similarly, a conviction will not be reversed merely because there was contradictory evidence, because minor or collateral discrepancies in testimony need not render a witness's entire testimony incredible, and because the task of the trier of fact is determining if and when a witness testified truthfully. *Gray*, 2017 IL 120958, ¶¶ 36, 47. When a finding of guilt depends on eyewitness testimony, we must decide whether a trier of fact could reasonably accept the testimony as true beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 36. We find eyewitness testimony insufficient only when the evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 36. Our supreme court has repeatedly found that a valid conviction may be based on a positive identification by a single eyewitness who had ample opportunity to observe.

*In re M.W.*, 232 Ill. 2d 408, 435 (2009). A trier of fact assesses the reliability of identification testimony in light of all the facts and circumstances including (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification. *M.W.*, 232 Ill. 2d at 435; *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. These are often referred to as the *Biggers* factors. *Joiner*, 2018 IL App (1st) 150343, ¶ 47 (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). No single *Biggers* factor by itself conclusively establishes the reliability of identification testimony; instead, the trier of fact must consider all the factors. *Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 78     Viewing the evidence in the light most favorable to the State as we are obligated to do, we find that a reasonable trier of fact could have found defendant guilty of aggravated battery beyond a reasonable doubt. Relying on the *Biggers* factors, although Akli was the single witness, his testimony was reliable. Akli's interaction with defendant lasted approximately two minutes and he was face-to-face with defendant for approximately five seconds as defendant attempted to give him $100 for rear-ending his vehicle, but Akli refused the money. During his testimony, Akli did not waiver or show any ambivalence or uncertainty. Several days after the attack, Akli was able to identify defendant in a photo-array with four other men with similar features, including their complexion, hair style and mustache. Less than two months later, Akli identified defendant in a physical lineup. Additionally, Akli's recollection of the vehicle defendant was driving at the time of the attack, a 1985 gold Oldsmobile, and his recording of the license plate number was also substantial evidence.

¶ 79    We find that Akli's testimony satisfied the *Biggers* factors. Based upon the foregoing, a reasonable trier of fact could reasonably accept the testimony as true beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 36.

¶ 80    Aside from Akli's testimony, the jury also considered Officer Dunn's testimony that when defendant was stopped in July of 2013, he was driving a gold 1985 Cutlass Supreme (Oldsmobile) with the license plate number L752588, and that defendant lived at 131 Cuyler, Oak Park, Illinois. The jury also considered the certified title from the vehicle registration which indicated that the vehicle was registered to the mother of defendant's daughter, with an address of 131 Cuyler, Oak Park, Illinois. The registration also reflected that the plate number recorded by Akli, L752588, was valid on the date of the attack, and was changed to S235926, less than two months later and a few days prior to defendant's arrest on July 22, 2013. Finally, the jury considered the evidence that after defendant was pulled over on July 22 for a minor traffic violation, and subsequently arrested, he was driving the same gold 1985 Oldsmobile. The license plate number was the same as the new number on the certified title, S235926.

¶ 81    Based upon the foregoing, we cannot say that defendant's conviction was so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of his guilt. *Gray*, 2017 IL 120958, ¶ 36; *Campbell*, 146 Ill. 2d at 375.

¶ 82                                    E.  Excessive Sentence

¶ 83    Defendant's final contention on appeal is that his extended-term sentence of eight years' imprisonment was excessive where the non-extended sentencing range is two to five years and where eight-year sentences are often imposed in cases involving arguably more egregious conduct or higher-class felonies.

¶ 84    A trial court's sentencing decision is reviewed under the abuse of discretion standard. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court will be found to have abused its discretion where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 85    Pursuant to section 5/12-3.05(h) of the Illinois Criminal Code, the sentence for a defendant convicted of aggravated battery, a Class 3 felony, is 2-5 years' imprisonment. 720 ILCS 5/12-3.05(h) (West 2016). Section 5/5-5-3.2(b)(1) of the Illinois Unified Code of Corrections provides, "(b) The following factors, related to all felonies, may be considered by the court as reasons to impose an extended term sentence under Section 5-8-2 upon any offender: (1) When a defendant is convicted of any felony, after having been previously convicted in Illinois or any other jurisdiction of the same or similar class felony or greater class felony, when such conviction has occurred within 10 years after the previous conviction, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts." 730 ILCS 5/5-5-3.2(b)(1) (West 2016). The sentence of imprisonment for an extended-term Class 3 felony is five to ten years. 730 ILCS 5/5-4.5(40)(a) (West 2016).

¶ 86    In this case, defendant was convicted of aggravated battery against Akli.  The aggravation evidence presented by the State revealed that defendant had previously been convicted of aggravated battery against an off-duty sheriff in 2009 for a similar incident which occurred in 2008. This conviction was approximately 5 years prior, involved a separate incident, and defendant was tried and convicted. This prior conviction made defendant eligible for extended term sentencing.  Based upon the foregoing, we cannot say that the trial court abused its discretion by sentencing defendant to an extended term of eight years' imprisonment.

¶ 87                                    CONCLUSION

¶ 88    For the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 89    Affirmed.